**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**SUSAN B. LONG and DAVID BURNHAM,**

|                                             |                    |
|---------------------------------------------|--------------------|
|                              **Plaintiffs,** | **5:05-CV-1522**   |
|                                             | **(NAM/DEP)**      |
| **v.**                                      |                    |
|                                             |                    |
| **OFFICE OF PERSONNEL MANAGEMENT**          |                    |
|                                             |                    |
|                              **Defendant.** |                    |

_____

**APPEARANCES:**                              **OF COUNSEL:**

Public Citizen Litigation Group               Adina H. Rosenbaum, Esq.
1600 20th Street NW                            Scott Nelson, Esq.
Washington, DC 20009
*Attorneys for Plaintiffs*

U.S. Department of Justice                     James Jules Schwartz,
Civil Division                                        Trial Attorney
20 Massachusetts Avenue NW
P.O. Box 883 Ben Franklin Station
Washington, DC 20044

Glenn T. Suddaby                              William H. Pease,
United States Attorney                         Assistant United States Attorney
100 South Clinton Street
Syracuse, NY 13261-7198
*Attorney for Defendant*

**Hon. Norman A. Mordue, Chief Judge:**

**MEMORANDUM DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiffs Susan B. Long and David Burnham bring this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  This action stems from the Office of Personnel Management's ("OPM") decision to withhold the names, duty station information, and performance based award amounts of certain federal employees on the basis that disclosure would violate the employees' privacy interests.  Plaintiffs seek to compel OPM to produce these records from its Central Personnel Data File ("CPDF"), a database which contains information about the federal civilian workforce.  Plaintiffs also seek to compel OPM to state the amount of information it redacted from the records it did provide and to indicate, at the point in the records where it made redactions, that information was deleted from that spot.  Additionally, plaintiffs request an order declaring that OPM's failure to produce the records they requested and that its failure to indicate, in the records it did provide, the amount of information OPM redacted, violates the FOIA.[1]  Presently before the Court are OPM's motion for summary judgment (Dkt. no. 12) and plaintiffs' cross motion for summary judgment (Dkt. no. 15).

## II.    BACKGROUND

The following facts are undisputed unless otherwise noted.  CPDF is a government wide database which contains information regarding the federal civilian workforce.  CPDF covers all federal civilian employees of the Executive Branch[2] and some employees of the Legislative

---

[1] In the Amended Complaint, plaintiffs also sought relief in connection with OPM's alleged failure to satisfy their FOIA request for a copy of its new data release policy and for "records concerning the policy review that resulted in that policy."  Am. Compl. ¶ 1.  Plaintiffs are withdrawing their claims in this regard.  Accordingly, the portions of OPM's motion for summary judgment which seek dismissal of these claims are denied as moot.

[2] The CPDF does not cover employees of the Central Intelligence Agency, Defense Intelligence Agency, Federal Reserve System - Board of Governors, National Geospatial - Intelligence Agency, National Security Agency, Office of the Vice President, Postal Rate Commission,

Branch,[3] including the Government Printing Office, the United States Tax Court, and "several small commissions".  From the information federal agencies submit, OPM builds four major databases: (1) status - an individual record of the status of each active employee as of the end of the fiscal quarter; (2) dynamics - a record of all personnel actions occurring during the fiscal quarter; (3) longitudinal history - extracts from dynamics files structured for trend analyses; and (4) organizational component code translation - the codes, titles, and hierarchical relationships for organizations within an agency.[4]

Plaintiffs Susan Long and David Burnham are Co-Directors of the Transactional Records Access Clearinghouse ("TRAC"), a data gathering, data research, and data distribution organization associated with Syracuse University, where plaintiffs are professors.  For more than a decade, plaintiffs have, through the FOIA, obtained copies of records from the CPDF.  Plaintiffs use the information to provide "the American people - and institutions of oversight such as Congress, news organizations, public interest groups, businesses, scholars, and lawyers - with comprehensive information about federal staffing, spending, and the enforcement activities of the federal government."  Am. Complaint. ¶ 4.

On October 8, 2004, Long, on behalf of TRAC, sent OPM a FOIA request for a copy of the "Status File" and "Dynamics File" for the March 2004 CPDF database.  Lukowski Decl., Ex. A.  In a letter dated November 23, 2004, Gary Lukowski, Manager of Workforce Information and Planning within the Strategic Human Resources Policy Office in OPM, acknowledged Long's

---

Tennessee Valley Authority, United States Postal Service, or White House Office.  Nor does the CPDF include non-United States citizens in foreign countries, non-appropriated fund personnel, or commissioned officers in the Department of Commerce, Department of Health and Human Services, Department of Homeland Security, and the Environmental Protection Agency.

[3]The CPDF does not cover employees of the Judicial Branch.

[4]OPM constructs the status, dynamics, and longitudinal history databases quarterly and the organizational component database at the end of March and September.

3

FOIA request and advised that OPM was conducting a review of its policy on disclosure of individual employee records as it related to the FOIA and the Privacy Act. *Id*. Ex. B. In a letter dated February 4, 2005, Long, on behalf of TRAC, sent OPM a FOIA request for the "Status and Dynamic Files" for the June and September 2004 CPDF as well as a copy of the OPM's "newly implemented data release policy". *Id*. Ex. F.

On April 15, 2005, OPM produced records from the March, June, and September 2004 CPDF files. *Id*. Ex. I. On June 13, 2005, Long requested, and on August 23, 2005, OPM produced, the "Status and Dynamic Files" for the March 2005 CPDF. *Id*. Exs. K, L. Unlike previous CPDF files plaintiffs had received, however, these files did not include any Department of Defense ("DOD") employee records. *Id*. Ex. L. In letters accompanying the CPDF files from OPM, Lukowski informed plaintiffs that OPM had excluded DOD employees from the files, and that plaintiffs should contact the DOD directly to obtain "Defense data". *Id*. According to plaintiffs, OPM, without explanation, also redacted names and most duty station[5] information for more than 150,000 other government employees. Long Decl. ¶ 7. Plaintiffs commenced this action on December 5, 2005. Dkt. no. 1. As discussed below, the parties, however, continued to correspond: plaintiffs submitted further FOIA requests, and OPM provided responses to the new requests as well as new copies of CPDF files in response to plaintiffs' prior FOIA requests.

On January 25, 2006, plaintiffs submitted a FOIA request to OPM for the "Status and Dynamics files" for the June and September 2005 CPDF. Lukowski Decl. Ex. M. OPM produced these files on February 22, 2006. *Id*. Ex. N. According to plaintiffs, OPM redacted these files, too, omitting all records on DOD employees, the names of all IRS employees, duty station information for approximately 23,000 IRS employees, and name and duty station

---

[5] According to Long, "the most geographically specific duty-station data elements OPM provides are city and county." Long Decl. ¶ 20.

information for approximately 139,000 employees in other federal agencies. Long Decl. ¶ 8. In a

letter accompanying these files, Lukowski explained the redactions as follows:

> For employees in occupations related to national security, Name and Location (i.e. State, City, County, C[ore] B[ased] S[tatistical] A[rea], Locality Pay Area, Law Enforcement Officer Geographic Area ID) data elements are masked. Also, employee names are suppressed for all employees of the Internal Revenue Service.

> As indicated previously, individual employee records for Department of Defense employees are excluded from the files provided; you will have to go directly to the Department of Defense for their data.

Lukowski Decl. Ex. N.

In a letter dated February 24, 2006, plaintiffs notified OPM that they were appealing

OPM's withholding of the information from OPM's disclosure of the June and September 2005

CPDF files. *Id*. Ex. O. In a letter dated March 28, 2006, Kathie Ann Whipple, Acting General

Counsel for OPM, denied plaintiffs' appeal. *Id*. Ex.P. Whipple explained that OPM withheld the

information "because it is information . . . contained in personnel files, the disclosure of which

would constitute a clearly unwarranted invasion of personal privacy under Exemption 6 of the

FOIA, 5 U.S.C. § 552 (b)(6)." *Id*. Whipple further explained that OPM had withheld the name

and location data elements of employees in sensitive occupations, the names and all location data

elements (except whether the employee worked inside or outside the Washington, D.C.

metropolitan area) for all employees of the Bureau of Alcohol, Tobacco, Firearms, and

Explosives ("ATF"), the Drug Enforcement Administration ("DEA"), the Secret Service, the

United States Mint, the names of all Internal Revenue Service ("IRS") employees, and all

information regarding DOD employees. *Id*. Whipple advised plaintiffs that OPM had referred

their FOIA request to the DOD and the IRS in accordance with OPM's agreements with those

agencies. *Id*. Whipple also stated that plaintiffs were "an indication of the redacted information

on the released portions of the record." *Id*. Plaintiffs filed an amended complaint in this action on April 13, 2006. Dkt. no. 9.

On June 6, 2006 and September 19, 2006, after the filing of this action, OPM provided plaintiffs with revised copies of the March, June, and September 2004 and 2005 CPDF files. OPM, however, continued to redact the names and specific duty station information for all employees of the DEA, ATF, U.S. Mint, and Secret Service or who worked in any of the 24 occupations OPM deemed sensitive. Long Decl. ¶ 11. According to plaintiffs, OPM also redacted the names and/or duty stations of 908 federal employees who neither work for the above enumerated agencies or in any of the 24 occupations OPM deemed sensitive. Long Decl. ¶ 14. Lukowski states that OPM redacted the names and/or duty stations of these particular employees because they worked either in a "sensitive occupation" or for the DEA, ATF, U.S. Mint, or Secret Service "at any point during the requested period". Second Lukowski Decl. ¶ 5. The IRS and OPM also provided plaintiffs with new copies of the March, June and September 2005 CPDF records regarding IRS employees which included the names of all employees except those who were employed in "sensitive" occupations or in the IRS's Registered Pseudonym Program. Long Decl. ¶ 12. Additionally, the IRS withheld the dollar amounts of the "Total Awards" for some of its employees on the ground that the award amounts could be used to calculate an employee's performance rating. Second Adams Decl. ¶ 6.

Long states that while she has "only had an opportunity to do a preliminary examination of the September 2005 CPDF file" that OPM provided on September 19, 2006, she has determined that in this file:

> OPM redacted the names and duty stations of employees in DEA, ATF, the U.S. Mint, and the Secret Service. For employees of these agencies not in the 24 occupations OPM labels "sensitive," it provided codes indicating when the employee worked inside the greater Washington, DC area. For all federal employees, OPM also redacted the names and duty stations of employees in the 24 occupations it labels "sensitive."

It also redacted all names of IRS employees and, for some IRS employees, it redacted information in the total award dollar field.  In addition, OPM redacted the names and/or duty stations of hundreds of other employees from a large number of agencies without providing an explanation for those redactions.

The CPDF files provided to us on September 19, 2006, also included a field, "Organizational Component," that had not been provided in any of the previous copies of these CPDF files. OPM had not informed us in its responses to our FOIA requests that it was withholding Organizational Component, had not mentioned the field in its Vaughn Index, and had not marked the field as redacted on the previously released files. In the September CPDF file released to us on September 19, 2006, OPM redacted Organizational Component for ATF, DEA, U.S. Mint, Secret Service, and Federal Bureau of Investigations employees, as well as for employees in the 24 occupations OPM labels "sensitive." In addition, OPM did not provide organizational component for any DOD employees. It also withheld organizational component for hundreds of other non-DOD employees without providing an explanation for those redactions.

Long Decl. ¶¶ 16-17.

On June 13, 2006, OPM provided plaintiffs with records relating to DOD civilian employees from the March, June, and September 2004 and 2005 CPDF files.  *Id.* ¶ 13.  OPM, however, "withheld names, duty station, and bargaining units from the records of every DOD employee."  *Id.*  On November 8, 2006, OPM provided plaintiffs with new copies of CPDF files pertaining to DOD employees.  Second Long Decl. ¶ 23.b.  Long states that she has "only had time to begin examining these new files, which . . . should contain over 4.6 million records".  Second Long Decl. ¶ 31.

Through this action, plaintiffs seek an order directing OPM: (1) to release from the March, June, and September 2004 and 2005 CPDFs (a) the names and duty stations of current and previous non-DOD employees in occupations OPM deems "sensitive", (b) the names and duty stations of all DEA, ATF, U.S. Mint, and Secret Service employees, and (c) the names, and duty stations data sets for all DOD employees; (2) to release from the March, June, and September 2005 CPDFs (a) the true names of 666 IRS employees who received pseudonyms before the enactment of the IRS Restructuring and Reform Act of 1998 (RRA), and (b) the "Total Award"

7

dollar amounts for IRS employees; and (3) to state the amount of information redacted from the records it provided to plaintiffs in response to their FOIA request and to indicate, at the point in the records where it made redactions, that it deleted information from that spot.  Finally, plaintiffs seek a declaration that OPM's failure to provide the records they requested, failure to state the amount of information it redacted from the records it provided, and its failure to indicate at the points in the records where it made redactions, that it deleted information from those spots, violates the FOIA.

## III.   DISCUSSION

In this case, OPM moves for summary judgment claiming that it properly withheld the files at issue in this case because they contained information falling within FOIA Exemption 6 and/or Exemption 3 and that it marked all redactions in the records it provided to plaintiff. Plaintiffs oppose OPM's motion and cross-move for summary judgment.

### A.   FOIA

 "FOIA was enacted to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed."  *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation marks omitted). "FOIA strongly favors a policy of disclosure and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act." *National Council of La Raza v. Department of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (citing 5 U.S.C. § 552(a)(3), (b)(1)-(9)).  Courts construe these exemptions narrowly, resolving all doubts "in favor of disclosure".  *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir.1988).  The government bears the burden of showing "that any claimed exemption applies." *National Council of La Raza*, 411 F.3d at 356.  Courts review the government's decision to withhold or redact information *de novo*.  5 U.S.C. § 552(a)(4)(B).

**B.      Summary Judgment Standard**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id*.  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id*. at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985).

The Second Circuit has described the procedure for resolving motions for summary judgment in FOIA cases as follows:

> In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA. Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden. Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face. When this is the case, the district court may forgo discovery and award summary judgment on the basis of affidavits.

In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.

*Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citations, internal footnote, and quotation marks omitted).

### C.   *Vaughn*[6] Index and Declarations

#### 1.   Non-DOD Employees

In support of its motion for summary judgment, OPM submitted a *Vaughn* Index regarding the information it withheld from the files of employees in occupations it deemed "sensitive" or who work for the DEA, ATF, U.S. Mint, or Secret Service:

I.   The following describes information withheld in full pursuant to Exemption 6, unless otherwise noted, that was located as a result of searches conducted at the Office of Personnel Management ("OPM") in response to plaintiff's five Freedom of Information Act requests concerning information from OPM's central personnel data file ("CPDF") from March 2004 onwards.

A.   Names, duty stations, core based statistical area ("CBSA"), combined statistical area ("CSA"), locality pay area ("LPA"),[7] and organizational component codes of federal employees located in OPM's central personnel data file in the following sensitive occupations:

| Title | Series Code |
|---|---|
| Correctional Officer | 0007 |
| United States Marshal | 0082 |
| Police | 0083 |
| Nuclear Materials Courier | 0084 |
| Intelligence | 0132 |
| Intelligence Clerk/Aide | 0134 |
| General National Resources & Biological Science | 0401 |

---

[6] *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

[7] According to Long, the "field Locality Pay Area . . . indicates whether special pay is provided to federal employees on the basis of their location.  There are only 33 different LPA code categories for the entire nation."  Long Decl. ¶ 22.

(DHS only)

| | |
|---|---|
| Plant Protection and Quarantine* | 0436 |
| Internal Revenue Agent | 0512 |
| Nuclear Engineering | 0840 |
| Hearings and Appeals | 0930 |
| Internal Revenue Officer | 1169 |
| General Inspection, Investigation and Compliance | 1801 |
| Compliance Inspection and Support | 1802 |
| General Investigating | 1810 |
| Criminal Investigating | 1811 |
| Game Law Enforcement | 1812 |
| Immigration Inspection | 1816 |
| Alcohol, Tobacco, and Firearms Inspection | 1854 |
| Customs & Border Protection Interdiction | 1881 |
| Custom Patrol Officer | 1884 |
| Customs Inspection | 1890 |
| Customs and Border Protection | 1895 |
| Border Patrol Agent | 1896 |

* The 0436 series has been cancelled but remains listed to prevent disclosure in releases of historical data

> B. Names, specific duty stations,* CBSA, CSA, LPA,** and organizational component codes of all employees in the following agencies:

Drug Enforcement
Bureau of Alcohol, Tobacco, Firearms and Explosives
U.S. Mint
Secret Service

* For those employees within the Washington CBSA, duty stations have been recoded to indicate "District of Columbia;" for those employees outside of the Washington CBSA, duty station locations have been redacted in their entirety.

** For those employees located within the Washington CBSA who are not in one of the occupations enumerated in I.A., CBSA, CSA, and LPA were provided.

> C. Organizational component codes of employees of the Federal Bureau of Investigation

> D. The names, duty stations, CBSA, CSA, LPA, organizational component codes, and bargaining unit information of U.S. Department

11

of Defense personnel.

Second Amended *Vaughn* Index.

OPM avers that it withheld the names and duty station information of employees who work in "sensitive occupations", because the positions involve national security, homeland security, or law enforcement.  In support of its decision to withhold this information, OPM submitted two declarations by Gary Lukowski, Manager of Workforce Information and Planning within the Strategic Human Resources Policy Office in OPM.  In the first declaration, Lukowski states:

> In response to plaintiffs' requests for 2004 and 2005 CPDF data OPM has withheld from release the names and duty stations of all individuals, currently or previously in sensitive occupations. The terrorist attacks of September 11, 2001, particularly the attack on the Pentagon, heightened OPM's awareness of the vulnerability of federal employees to terrorist attacks anywhere within the United States based solely on the fact that personnel work for the federal government. This concern led OPM to take a number of affirmative steps to better protect the safety of federal employees, including developing a new data release policy. Accordingly, OPM has adopted a data release policy that takes into account both the sensitivity of particular occupations and the heightened privacy interest individuals in these occupations have in shielding their identities and duty stations from public release, as well as OPM's duty to consider and protect national security interests making decisions about the release of information in the CPDF.

> The information provided to plaintiffs excludes those federal employees who are or have been in "sensitive occupations," as enumerated in the *Vaughn* index.  While recognizing that certain basic information is available on any Federal employee, OPM is sensitive to the concerns of the various Federal employees in national security, homeland security, law enforcement or other sensitive occupations, who by virtue of their work or their agency's mission, are themselves and their families, potentially put in harm's way. A terrorist, whether foreign or domestic, who knew the names and duty stations of these categories of Federal personnel could use information available on the Internet to determine their home addresses. Attacks on homes and families could then be planned and carried out. Armed with information regarding the number of certain categories of personnel and where they worked, foreign or domestic terrorists could also plan an attack designed to kill or injure individuals in specific types of sensitive occupations. These employees also are more vulnerable and likely to be exposed to harassment and unwarranted attention as a direct result of their work, whether it be to further criminal purposes or merely to vent misplaced frustrations. Given the world security climate, and the attendant heightened risk of endangerment

and harassment, I protected the identities and duty station locations of Federal employees in occupations enumerated in the *Vaughn* Index.

Lukowski Decl. ¶ 31.

Lukowski further explained in his second declaration:

Although OPM made some of the information on government employees available to the public until 2003, a number of events occurred in 2004 that brought the altered security climate to the policy forefront within OPM with regard to its disclosure of government-wide data on federal employees, and caused OPM to undertake a large scale review of its policies.

First, shortly after the September 11 attacks, DOD issued a much more restrictive data release policy with regard to its employees. In early 2004, OPM was contacted by officials of the Department of Defense, requesting that OPM refer all FOIA requests pertaining to DOD employees back to DOD for processing, rather than releasing the information, as OPM had done historically.  DOD's new policy, in addition to changing how OPM handled DOD personnel information, also influenced OPM's reconsideration of how it released and withheld other personnel information. Second, the September 11 and anthrax attacks made OPM reevaluate its disclosure policy regarding personnel from other agencies.

Finally, the timing of OPM's decision to review its data release policy was also partly a response to a significant outcry from a number of agencies and their employees precipitated by a Washington Post feature regarding the availability of federal employee data. This story included a "lookup" of federal employee data that enabled readers to obtain a person's name, position title, grade, and bonus information. See http://www.washingtonpost.com/wpsrv/ politics/govt/workers/faq.htm.  After the feature story was published in or around June of 2004, numerous individuals and agencies contacted OPM, expressing concern for the safety of themselves, their employees, and family members. Among the agencies that contacted OPM were the U.S. Marshal Service and the Department of Treasury's Financial Crimes Enforcement Network.

The outcry from agencies and employees as a result of the Washington Post article caused OPM to take a closer look at its data release policy and consider the concerns of the agencies and employees who contacted OPM. After the comprehensive policy review in 2004, the former OPM Director signed a data release policy in December 2004. Although OPM determined that most of the information provided to the Washington Post was releasable pursuant to FOIA, the policy identified twenty-two sensitive occupations whose personnel information would be withheld, set forth the policies pertaining to the withholding of all FBI, ATF, DEA, Secret Service, and US Mint employee names and other personnel information, and established OPM's new procedure of referring DOD FOIA requests to the DOD for response. Occupations were deemed "sensitive" if OPM determined that information about the identity and location of employees in those positions would be useful for selecting one or more

13

specific targets and/or for the planning and executing an attack on a potential target. Similar to the rationale for withholding information on FBI, ATF, DEA, Secret Service, and U.S. Mint employees, OPM determined that employees in these specific occupations also are more vulnerable and likely to be exposed to harassment and unwarranted attention as a direct result of their work, whether it be to further criminal purposes or merely to vent misplaced frustrations.

As Exemption 6 of the FOIA requires, OPM, in making these new policies, balanced the extremely strong privacy interests of the individuals in each sensitive occupation in their names and duty station location information against any public interest and determined that their privacy interests heavily outweighed the virtually non-existent public interest in this information.

Plaintiffs argue in their memorandum that due to the terrorist attacks of September 11th, there was an increased public concern over the porousness of the nation's border with Canada; and therefore, the public needs to know the specific duty stations of Border Patrol agents in order to determine whether the government has increased patrol of the northern border. Plaintiffs' reasoning, however, illustrates why, in the wrong hands, the information could provide a continuing security concern. Providing detailed location data that shows where Border Patrol agents are located could be used by international terrorists or criminals trying to enter the country illegally to target Border Patrol agents for attack or harassment. Revealing where coverage has been increased also exposes where coverage has not increased, and these areas could be seen as "low risk" for people attempting to attack or harass Border Patrol agents in order to enter the country illegally. Plaintiffs also question OPM's withholding of information on individuals in "Hearings and Appeals" occupations. This occupational series was added at the request of the Department of Homeland Security ("DHS") due to the involvement of such personnel in immigration and border issues. It was determined that the nature of their jobs exposed them to increased likelihood of harassment or attack and that their identities and duty station locations should be protected accordingly.

OPM's data release policy was updated in March 2006. The new policy included further agreements made with the IRS to protect names of employees participating in their registered pseudonym program as well as particular bonus information of employees covered under the collective bargaining agreement. In addition, the new policy listed an additional two occupations as sensitive. One of the occupations added was General National Resources and Biological Science, which is considered a sensitive occupation only at DHS. This occupation was added to continue protecting employees in the Plant Protection and Quarantine occupation who were reclassified into the general biological sciences occupation in early FY 2004. These positions are located in the Bureau of Customs and Border Protection and their addition to the list of sensitive occupations was requested by DHS at the same time as the Hearings and Appeals positions due to the nature of their work with drug plants and the need to keep their identities protected to avoid potential harassment and retribution.

Second Lukowski Decl. ¶ 4.

Regarding the individual agencies, Lukowski stated:

> For reasons similar to those enumerated in paragraph (31), OPM has also withheld from release the names and specific duty stations of all employees in the Drug Enforcement Agency, Alcohol-Tobacco-Firearms, and U.S. Mint. In lieu of specific duty stations, OPM listed whether the person was located within the DC Metro Area or outside of the DC Metro Area. These withholdings were based on a determination that the mission and nature of the work performed by those agencies rendered not only individuals in specific occupations within the agencies, but any employee in the agency, vulnerable to harassment or attack, and therefore accorded them increased privacy interests in their identities and work addresses.

Lukowski Decl. ¶ 32.  Lukowski further explained in his second declaration:

> The withholding of information of all employees of enforcement or security agencies such as the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), U.S. Drug Enforcement Administration ("DEA"), United States Secret Service, U.S. Mint, and sensitive occupation employees in other agencies evolved over time. Sensitive occupation employees include those employees who are or have been in occupations related to law enforcement, national security, homeland security, or other positions that, if identified, have the potential to significantly compromise the security of persons, properties or systems.

> The withholding of data for the FBI, ATF, DEA, Secret Service, and US Mint employees predates the post-September 11th heightened terrorist security environment and was based on an assessment by the agencies in conjunction with OPM that, because of the extremely sensitive and dangerous nature of the work conducted by the agencies and their particular missions, foreign and domestic enemies of the United States and international and domestic criminal elements might see anyone connected with those agencies as a target for harassment, attack, or infiltration. Therefore, OPM determined, after an intensive review of each category of personnel, that the extremely strong privacy interests of all of the employees of these agencies in their names and duty station locations heavily outweighed the virtually non-existent public interest in this information.

> For example, the FBI is charged with, inter alia, protecting and defending the citizens of the United States from domestic and international terrorists and foreign intelligence operations and espionage. See FBI Priorities (available at http://www.fbi.gov/priorities/priorities.htm). The FBI also protects the United States by combating cyber-based attacks and high-technology crimes, public corruption at all levels, transnational and national criminal organizations and enterprises, major white collar crime, and significant violent crime. It also protects civil rights and supports federal, state, county, municipal, and international partners. OPM, working with the FBI, determined that the nature of the FBI's mission makes ALL FBI personnel and their families targets for dangerous organizations and individuals, including domestic and international terrorists, foreign intelligence agencies, organized criminal groups, and other violent and sophisticated criminals. These

organizations and individuals could target ANY FBI employee for attacks and harassment as a means of degrading the ability of the FBI to carry out its mission or vent misplaced frustrations against the FBI. For these reasons, OPM determined that ALL FBI employees have an extremely strong privacy interest in their names, duty stations, award and prior data element information, that heavily outweighs the virtually non-existent public interest in this information. From about 1987 onwards, the FBI sent OPM data on its employees without names, with duty stations indicated as either "DC" or "outside DC," and with no award or prior data element information.

Similarly, the ATF is a principal law enforcement agency within the United States Department of Justice dedicated to preventing terrorism, reducing violent crime, and protecting our Nation. See About ATF (available at http://www.atf.treas.gov/about/mission.htm). The men and women of ATF perform the dual responsibilities of enforcing federal criminal laws and regulating the firearms and explosives industries. The ATF is committed to working directly, and through partnerships, to investigate and reduce crime involving firearms and explosives, acts of arson, and illegal trafficking of alcohol and tobacco products. OPM, working with ATF, determined that the nature of the ATF's mission makes ALL ATF personnel and their families targets for attacks and harassment by violent criminals and criminal organizations who employ firearms and explosives, arsonists, and individuals and organizations who illegally traffic in alcohol and tobacco products. These organizations and individuals could target ANY ATF employee as a means of degrading the ability of the ATF to carry out its mission or vent misplaced frustrations against the ATF. In 1996 officials of the ATF requested that their personnel data receive protective treatment similar to that being accorded the FBI, and because of OPM's determination that ALL employees of the ATF have an extremely strong privacy interest in their personnel information, because of the ATF's extremely sensitive and dangerous law enforcement mission, that heavily outweighs the virtually non-existent public interest in this information, OPM complied with ATF's request.

Further, the mission of the DEA makes ALL of its personnel and their families potential targets. The mission of the DEA is to enforce the controlled substances laws and regulations of the United States and bring to the criminal and civil justice system of the United States, or any other competent jurisdiction, those organizations and principal members of organizations, involved in the growing, manufacture, or distribution of controlled substances appearing in or destined for illicit traffic in the United States; and to recommend and support non-enforcement programs aimed at reducing the availability of illicit controlled substances on the domestic and international markets. See DEA Mission Statement (available at http://www.dea.gov/agency/mission.htm).

In carrying out its mission, the DEA's primary responsibilities include: investigation and preparation for the prosecution of major violators of controlled substance laws operating at interstate and international levels; investigation and preparation for prosecution of criminals and drug gangs who perpetrate violence in our communities and terrorize citizens through fear and intimidation; management of a national drug intelligence program in cooperation with federal, state, local, and foreign officials to

collect, analyze, and disseminate strategic and operational drug intelligence information. DEA personnel are also responsible for, inter alia, seizure and forfeiture of assets derived from, traceable to, or intended to be used for illicit drug trafficking; coordination and cooperation with federal, state and local law enforcement officials on mutual drug enforcement efforts and enhancement of such efforts through exploitation of potential interstate and international investigations beyond local or limited federal jurisdictions and resources; responsibility, under the policy guidance of the Secretary of State and U.S. Ambassadors, for all programs associated with drug law enforcement counterparts in foreign countries; and liaison with the United Nations, Interpol, and other organizations on matters relating to international drug control programs.

OPM determined that the nature of DEA's mission makes ALL DEA personnel and their families targets for attacks and harassment by the violent criminals and criminal organizations who manufacture, grow, and distribute controlled substances. Criminal organizations and individuals could target ANY DEA employee as a means of degrading the ability of the DEA to carry out its mission or vent misplaced frustrations against the DEA. Therefore, OPM determined that these individuals have an extremely strong privacy interest in their identities and duty station location information that heavily outweighs the virtually non-existent public interest in this information.

Additionally, the Secret Service's mission exposes ALL of its personnel to attack and harassment. The Secret Service is mandated by statute and executive order to carry out two significant missions: protection and criminal investigations. U.S. Secret Service Mission Statement (available at http://www.secretservice.gov/mission.shtml). The Secret Service protects the President and Vice President, their families, heads of state, and other designated individuals; investigates threats against these protectees; protects the White House, Vice President's Residence, Foreign Missions, and other buildings within Washington, D.C.; and plans and implements security designs for designated National Security Events. The Secret Service also investigates violations of laws relating to counterfeiting of securities and obligations of the United States, financial crimes that include, but are not limited to, access device fraud, financial institution fraud, identity theft, computer fraud; and computer based attacks on our nation's financial, banking, and telecommunications infrastructure. OPM determined that the extremely sensitive nature of the Secret Service's mission makes ALL Secret Service personnel and their families targets for attacks and harassment by international and domestic terrorists, foreign enemies, and violent criminals and criminal organizations. These organizations and individuals could target ANY Secret Service employee as a means of degrading the ability of the Secret Service to carry out its mission to protect the President, Vice President, foreign head of state, and other designated individuals from assassination, attack, and harassment, and to conduct criminal investigations. Such organizations and individuals could similarly target ANY Secret Service employee to vent misplaced frustrations against the Secret Service. Therefore, OPM, concluded that ALL Secret Service personnel have any extremely strong privacy interest in their identities and duty station location information that heavily outweighs the virtually non-existent public interest in this

information, OPM made the determination, as of September 2000, to process requests for DEA and Secret Service data in the same way that OPM processes requests for FBI data. (It should be noted that while OPM discussed the withholding of the names and duty stations of Secret Service employees in its initial Vaughn Index, OPM inadvertently did not include a discussion of the withholding of this information in its Motion for Summary Judgment and the supporting Lukowski declaration. The Opposition and Reply and this declaration remedy this oversight.)

When OPM undertook its comprehensive review of its data release policies, see infra, OPM determined that the U.S. Mint's mission exposes ALL of its personnel to attack and harassment. The primary mission of the U.S. Mint is to produce an adequate volume of circulating coinage for the nation to conduct its trade and commerce. U.S. Mint Mission (available at http://www.usmint.gov/about_the mint/). The U.S. Mint also has numerous other responsibilities, including, distributing U.S. coins to the Federal Reserve banks and branches; maintaining physical custody and protection of the Nation's $100 billion of U.S. gold and silver assets, and overseeing production facilities in Denver, Philadelphia, San Francisco, and West Point, as well as the U.S. Bullion Depository at Fort Knox, Kentucky. OPM  determined that the nature of the U.S. Mint's mission and the volume of assets at stake make ALL U.S. Mint personnel and their families targets for attacks, harassment, and infiltration by international and domestic terrorists, foreign powers, and violent criminals and criminal organizations. These organizations and individuals could target ANY U.S. Mint employee as a means of stealing currency or other assets, degrading the ability of the U.S. Mint to carry out its mission, or venting misplaced frustrations against the U.S. Mint. Therefore, OPM, after consulting with the U.S. Mint, concluded that ALL U.S. Mint personnel have an extremely strong privacy interest in their identities and duty station location information that heavily outweighs the virtually non-existent public interest in this information. OPM put protections in place for all employees of the U.S. Mint along with the implementation of the new data release policy and applied it retroactively beginning in CY 2004.

Second Lukowski Decl. ¶ 3.

## 2.   DOD Employees

OPM submitted a *Vaughn* Index from the DOD, which states:

Data elements in CPDF files.  OPM provided plaintiffs with data fields containing the following data elements for DOD personnel:  Agency Sub-element, Occupation, Supervisory Status, Work Schedule, Pay Plain, Grade, Step, Salary/Rate, Combined Statistical Area, Fair Labor Standards Act ID, Functional Classification, GS Related Grade, Locality Adjustment ID, Core Based Statistical Area, Occupational Category, Basic Pay, Locality Adjustment, Adjusted Basic Pay, Cost of Living Allowance, Retention Allowance, Supervisory Differential, Total Pay, Pay Basis Pay Rate Determinant, Pay Status, Personnel Office ID, Service Comp Date, Special Pay Table ID, Veteran Status, Senior Pay Level Indicator, Total Award, Prior Adjusted Basic Pay, Prior Basic Pay, Prior Duty Station, Prior Grade, Prior Locality Adjustment,

Prior Locality Pay Area, Prior Pay Basis, Prior Pay Plan, Prior Pay Rate Determinant,
Prior Step/Rate, Prior Work Schedule.
OPM also provided a translation file for the data containing: the Standard Code Table
ID, Data Code, and Data Code Translation.

U.S. Department of Defense *Vaughn* Index.

In support of its decision to withhold the names and duty station information of all civilian

DOD employees, OPM has submitted two declarations by Michael B. Donley, Director,

Administration and Management, Office of the Secretary of Defense.  In his first declaration,

Donley explains:

> Prior to the events of September 11, 2001, personally identifying information of DOD
> personnel, except for those assigned to overseas, sensitive, and routinely deployable
> units, was routinely released by both OPM and DOD.  Release of names and
> identifying information of personnel assigned to these types of units was, and
> continues to be, denied.  Due to the national emergency declared by the President
> after the events of September 11, DOD reevaluated its policy of releasing personally
> identifying information of its employees, and no longer does so.

Donley Decl. ¶ 5.  Donley further explained that "[f]or DOD . . . the attack on the Pentagon of

September 11, 2001, instilled a new sense of personal vulnerability and created a need for greater

security for DOD personnel . . . .  *Id*. ¶ 10.  Within the DOD, many . . . extensive measures have

been taken both within the United States and abroad to protect military and civilian personnel and

their families against the modern threat posed by terrorists and other enemies of the United States.

*Id*. ¶ 11.  Further:

> [b]ecause of the September 11 attacks and the war against terrorism, the Deputy
> Secretary of Defense issued a memorandum dated October 18, 2001 . . . to all DOD
> components advising them that "[m]uch of the information we use to conduct DOD's
> operations must be withheld from the public because of its sensitivity."  In light of
> this guidance, it was determined . . . that the practice of releasing lists of names and
> personally identifying information of FOF personnel not protected by 10 U.S.C. §
> 130b would identify personnel performing specific DOD missions that could allow
> enemies of the United States to target these individuals with the intent to harass, stalk,
> or cause harm in order to degrade the individual's or group's performance and thus
> threaten national and homeland security.  Therefore, on November 9, 2001, [David]
> Cooke issued a specific policy addressing the withholding of lists of names of DOD
> employees under FOIA.  The new disclosure policy directs all DOD Components to

> deny requests under the FOIA for "lists of names and other personally identifying information of personnel currently or recently assigned with in a particular component, unit, organization, or office within the Department of Defense."

*Id*. ¶ 12.  In the wake of September 11, 2001, the DOD FOIA Office reevaluated the release of personally identifying information of DOD personnel, what they do, and where they can be found under the FOIA because this information can potentially aid enemies of the United States." *Id*. ¶ 15.

In his second declaration, Donley clarified his previous references to the relevance of the events of September 11, explaining that he made them:

> to show the Court that those events have dramatically changed the way the federal government, especially the Department of Defense, conducts the United States of America's business.  These events, and the wars the country is currently engaged in Afghanistan and Iraq, have heightened the Defense Department's security awareness, and that in turn has caused us to look at ways to prevent future terrorist attacks and better ensure the safety of our personnel by proactive security precautions.  Numerous security measures are now in place for just the purpose of preventing future attacks and protecting DOD personnel.  The idea behind such security measures is that a layered response is most effective in dealing with threats that are as yet unknown.  The policy to withhold the names of DOD personnel is not the 'silver bullet' that will by itself prevent an attack such as the one on the Pentagon; however, it is part of a larger security system designed to enable DOD to prevent attacks directed at any and all DOD personnel.  The Department of Defense, through changes in security procedures and regulations including the policy at issue here, is trying to make it as difficult as possible for adversaries to collect valuable information that will enable them to carry out attacks on DOD personnel.

Second Donley Decl. ¶ 3.

### 3.    IRS Employees

OPM submitted a *Vaughn* Index regarding the information it withheld regarding IRS employees:

> II.    The following describes information withheld in full pursuant to Exemption 6, unless otherwise noted, that were located as a result of searches conducted at the Office of Personnel Management ("OPM") in response to plaintiff's Freedom of Information Act requests from March 2005 onwards.
>
> A.    Names of all Internal Revenue Service ("IRS") Employees.*

B.       Individual Cash awards (Nature of Action Code 840) and Performance Awards (Nature of Action Code 885) for all non-SES employees of the IRS.

\* Subsequently, the IRS provided the names of all employees who were not in their Registered Pseudonym Program.

Second Amended *Vaughn* Index.

### D.       Exemption 6

"[P]ersonnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" are exempt from the FOIA disclosure.  5 U.S.C. § 552(b)(6).  The determination of whether Exemption 6 applies, requires a two step inquiry.  "First, we must determine whether the personal information is contained in a file similar to a medical or personnel file."  *Wood v. Federal Bureau of Investigation*, 432 F.3d 78, 86 (2d Cir. 2005).  The parties agree that the employment files at issue are personnel files, thus the Court proceeds to the second step.  "At the second step of the analysis under Exemption 6, we balance the public's need for the information against the individual's privacy interest to determine whether the disclosure . . . would constitute a 'clearly unwarranted invasion of privacy.'"  *Id.* (quoting 5 U.S.C. § 552(b)(6)).  The Second Circuit has explained:

> The privacy side of the balancing test is broad and encompasses all interests involving the individual's control of information concerning his or her person.  On the other side of the balance, the relevant interest is the extent to which disclosure of the information sought would she [d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.

*Id.* at 88 (internal citation and quotation marks omitted).

### 1.       Non-DOD and DOD Employees

#### a.       Privacy Interest

In this case, plaintiffs seek the names and duty station information OPM withheld for employees engaged in one of the occupations it deems "sensitive", or employed by the ATF,

DEA, U.S. Mint, or DOD.  OPM contends that these employees have a privacy interest in the dissemination of their names and duty station information because the nature of their employment, which involves national security, homeland security, or law enforcement, makes them vulnerable to harassment or attack.  Although "individuals, including government employees and officials, have privacy interests in the dissemination of their names", *Massey v. FBI*, 3 F.3d 620, 624 (2d Cir. 1993) (citing *Federal Labor Relations Auth. v. United States Dep't of Veterans Affairs*, 958 F.2d 503, 510-11 (2d Cir. 1992); *Kuzma v. Internal Revenue Serv*., 775 F.2d 66, 69 (2d Cir. 1985)), disclosure "do[es] not always present a significant threat to an individual's privacy interest.  Instead, whether the disclosure of names of government employees threatens a significant privacy interest depends on the consequences likely to ensue from disclosure." *Wood*, 432 F.3d at 88 (citing *United States Dep't of State v. Ray*, 502 U.S. 164, 177, n.12 (1991) (internal citation omitted)).

OPM, through its declarations, specifically addresses its decision to withhold the names and duty stations of individuals employed in the following "sensitive occupations": General National Resources & Biological Science (DHS only), Plant Protection and Quarantine, Hearings and Appeals, and Border Patrol Agent.  In his second declaration, Lukowski explains that "international terrorists" or "criminals trying to enter the country illegally" could use "detailed location data" to target Border Patrol agents for "attack or harassment".  ¶ 4.  Further, Lukowski states, that revealing where border coverage has increased would expose the areas where coverage has not increased "and these areas could be seen as 'low risk' for people attempting to attack or harass Border Patrol agents in order to enter the country illegally." *Id*.  Regarding employees in the "Hearings and Appeals" occupation, Lukowski states that these individuals are involved in immigration and border issues and the nature of these jobs exposes them to "increased likelihood of harassment or attack", thus their identities and duty stations should be protected. *Id*.

22

According to Lukowski, employees in General National Resources and Biological Science and Plant Protection and Quarantine occupations, within the Department of Homeland Security, work with "drug plants", and, consequently, the exposure of their identities would subject them to "potential harassment and retribution."  *Id.*  Thus, OPM has offered "reasonably detailed explanations", *Carney*, 19 F.3d at 812, *supra*, why the exposure of the names and duty stations of employees engaged in these occupations could lead to the harassment or attack.

There are, however, twenty other occupations OPM deems "sensitive", including: Correctional Officer; United States Marshal, Police; Nuclear Materials Courier; Intelligence; Intelligence Clerk/Aide; Internal Revenue Agent; Nuclear Engineering; Internal Revenue Officer; General Inspection, Investigation and Compliance; Compliance Inspection and Support; General Investigating; Criminal Investigating; Game Law Enforcement; Immigrations Inspection; Alcohol, Tobacco and Firearms Inspection; Customs & Border Protection Interdiction; Custom Patrol Officer; Customs Inspection; Customs and Border Protection.  OPM offers no explanation why these remaining occupations are "sensitive."  Lukowski states only that they relate to law enforcement, homeland security, or national security.  While it is logical to conclude, based on their titles, that occupations such as Correctional Officer, United States Marshal, and Police, fall within the law enforcement category, the record contains no specific explanation why employees in any of these occupations would be subject to a heightened risk of harassment or attack if identified by name and duty station.  Thus, OPM has failed to raise an identifiable privacy interest with regard to the nondisclosure of the names and duty stations of employees in these "sensitive" occupations.

OPM also seeks to withhold name and duty station information for every employee of the ATF, DEA, Secret Service, and U.S. Mint.  In his declarations, Lukowski specifically addresses each agency and its mission and explains that sensitive and dangerous nature of the work

conducted by these agencies makes their employees targets for harassment or attack by foreign and domestic enemies of the United States as well as international and domestic criminal elements.  Thus, OPM has demonstrated that these employees have more than a *de minimis* privacy interest in the nondisclosure of their names and duty stations.

Finally, the Court finds that OPM has shown that DOD employees have more than a *de minimis* privacy interest in the nondisclosure of their names and duty stations.  According to Donley, the President's declaration of a national emergency after the events of September 11 prompted the DOD to "reevaluate[] its policy of releasing personally identifying information of its employees, and no longer does so."  Donley Decl. ¶ 5.  Donley further explained that disclosure of lists of names and duty stations of DOD employees could allow enemies of the United States to target DOD employees performing specific missions for harassment or attack. Donley stated that the "policy to withhold the names of DOD personnel is not the 'silver bullet' that will by itself prevent an attack such as the one on the Pentagon; however, it is part of a larger security system designed to enable DOD to prevent attacks directed at any and all DOD personnel."  Second Donley Decl. ¶ 3.  Thus, the Court concludes based on the consequences that OPM has indicated are likely to ensue from disclosure, employees engaged in General National Resources & Biological Science (DHS only), Plant Protection and Quarantine, Hearings and Appeals, and Border Patrol Agent occupations as well as all employees of the ATF, DEA, Secret Service, U.S. Mint, and DOD have a privacy interest[8] in their names and duty stations "to the

_____

[8] Plaintiffs argue that DOD and OPM regulations, 32 C.F.R. § 286 and 5 C.F.R. § 293.311, provide for the release of the names and duty stations of DOD civilian employees and federal employees may be released.  The DOD regulation states that normally, name and duty station information of DOD civilian employees are releasable.  In his declaration, Donley explains the DOD's policy of not releasing lists of names of DOD personnel has not been incorporated into its FOIA regulation because "it was believed that this would only be a temporary policy".  Second Donley Decl. ¶ 6.  In view of the DOD's present policy, which has been in effect since November 9, 2001, and specifically states that the DOD "shall ordinarily withhold lists of names and other personally identifying information of personnel" in the DOD, Donley Decl. Ex. 1, the

extent that revelation of their identities 'could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs.'" *Halpern v. Federal Bureau of Investigation*, 181 F.3d 279, 297 (2d Cir. 1999) (quoting *Massey*, 3 F.3d at 624); *see also Wood*, 432 F.3d 78, 88 (2d Cir. 2005) ("This Court and others have recognized government investigative personnel may be subject to harassment or embarrassment if their identities are disclosed.").

### b. Public Interest

The Court next addresses whether there is any public interest in the disclosure of the names and duty stations employees engaged in General National Resources & Biological Science (DHS only), Plant Protection and Quarantine, Hearings and Appeals, and Border Patrol Agent occupations, or who work for the ATF, DEA, Secret Service, U.S. Mint, or DOD.  The "only relevant public interest ... to be weighed in this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is contribut[ing] significantly to public understanding of the operations of activities of the government." *Federal Labor Relations Authority*, 510 U.S. at 495 (quoting *Department of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 775 (1989)).

In support of its assertion that the public interest in disclosure of employee names and duty stations is strong because such information can reveal "*what their government is up to*", *Reporters Comm.*, 489 U.S. at 773 (quotation marks omitted), plaintiffs have submitted a number

---

Court concludes, that the DOD regulation does not require a finding that, as a matter of law, DOD civilian employees have no privacy interest in their names and duty stations.  Indeed, the policy in effect, provides a basis for concluding that DOD employees have reason to believe that their names and duty stations will not be made public.

OPM's regulation only provides that name and duty station information about "*most*" federal employees is available to the public. 5 C.F.R. § 293.311.  Thus, it "does not necessarily follow that Section 293.311(a) requires the release of such information about those federal employees who are or have been in occupations deemed 'sensitive' because they involve national security, homeland security or law enforcement." *Center for Public Integrity v. United States Office of Personnel Management*, No. 04-1274, 2006 WL 3498089, at *5, n.7 (D.D.C. Dec. 4, 2006).

of declarations.  Long explains that having access to the names of federal employees is also important for monitoring the government's activities.  For example, Long states, TRAC issued a report in 2004 analyzing the criminal enforcement of the nation's wildlife laws.  Long Decl. ¶ 36. According to Long, the report concluded that "the most striking aspect of federal wildlife prosecutions is their concentration in a handful of federal judicial districts."  *Id*.  Long avers that having the name and duty station information of federal wildlife investigators "allowed us to conclude that the nation's record in enforcing wildlife laws during this period appeared to be the result of the determined effort of just a handful of investigators."  *Id*.  TRAC, however, can no longer "carry out the same type of examination" because OPM is withholding the names and duty stations of these investigators.  Long further states that knowing the names of federal employees "allows the public to examine whether employees are qualified." *Id*. ¶ 39.  Long asserts that TRAC receives inquiries from reporters, organizations and citizens seeking information about the activities of federal officials seeking elected office, and that with the information it had from the CPDF files, TRAC could determine when that individual was employed and "in what capacity". *Id*. ¶ 40.  According to Long, using information from TRAC, a reporter was able to expose inconsistencies between a political candidate's claims and his record as an Assistant United States Attorney.  *Id*.  Further, Long states, names can reveal the amount of turnover within an agency, "which indicates how the agency functions" and could show "a low level of morale or other problems in the agency's governance."  *Id*. ¶ 41.

Regarding duty station, Long states that this information is "extremely useful" because "[t]he availability of federal staff determines what the federal government can accomplish."  ¶ 29. For example, "[o]ver the years TRAC has published many studies examining how agency employees are deployed geographically and the impact that these levels of staff deployment have had on the government activity in various communities."  *Id*.

26

As an initial matter, the Second Circuit has rejected the argument that the disclosure of lists of names of an agency's personnel might shed light on agency activities, explaining "[c]ompelling disclosure of personal information, that has no relationship to an agency's activities, on so attenuated a basis would inevitably result in the disclosure of virtually all personal information, thereby effectively eviscerating the protections of privacy provided by Exemption 6." *Federal Labor Relations Auth. v. United States Dep't of Veterans Affairs*, 958 F.2d 503, 512 (2d Cir. 1992).   Moreover, the Second Circuit has instructed that in "determining the public's interest in disclosure of a government employee's identity", *Wood*, 432 F.3d at 88, courts should consider five factors:

> (1) the government employee's rank; (2) the degree of wrongdoing and strength of evidence against the employee; (3) whether there are other ways to obtain the information; (4) whether the information sought sheds light on a government activity; and (5) whether the information sought is related to job function or is of a personal nature.

*Perlman v. United States Dep't of Justice*, 312 F.3d 100, 107 (2d Cir. 2002).   "The factors are not all inclusive, and no one factor is dispositive." *Id*.

In this case, plaintiffs seek the names of employees of all levels who are engaged in engaged in General National Resources & Biological Science (DHS only), Plant Protection and Quarantine, Hearings and Appeals, and Border Patrol Agent occupations or work for the ATF, DEA, Secret Service, U.S. Mint, or DOD.  Although plaintiffs have submitted declarations from reporters who, using information from TRAC, have uncovered government wrongdoing,[9]

_____

[9] James Neff, investigations editor for the Seattle Times, state in his declaration that the Seattle Times regularly uses information on the federal workforce that it gets from TRAC.  Neff explains that "[t]o do public service journalism, it is necessary to know who works where, and the TRAC data provided us with that information for federal government employees."  Neff Decl. ¶ 2.  Neff avers that with access to the names and duty station information of federal government employees the Seattle Times was able to uncover "improper behavior" by Transportation Security Administration employees in King County, Washington by pulling up their names and contacting them to discuss security at Seattle Tacoma International Airport. *Id.* ¶ 4.

plaintiffs submit no actual evidence of wrongdoing, thus this factor weighs against disclosure.  *Cf.* *Perlman*, 312 F.3d at 107 ("Strong evidence of wrongdoing, combined with a serious offense, would weigh in favor of disclosure.").

According to plaintiffs, there are other ways of obtaining some of this information, from individual agencies, the phone book, or the Internet, for example, but assert that they prefer to use OPM's organized data.  Plaintiffs argue this factor weighs in favor of disclosure.  "An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form."  *Federal Labor Relations Auth.*, 510 U.S. at 500.  Thus, plaintiffs' argument is without merit.

Plaintiffs argue that the names and duty station of federal personnel will shed light on government activity because that information will reveal who is working for the government and where he or she is employed.  "This factor examines whether the information sought furthers FOIA's main purpose of 'open[ing] agency action to the light of public scrutiny'".  *Perlman*, 312 F.3d at 108 (quoting *Department of Air Force v. Rose*, 425 U.S. 352, 372 (1976)).  Plaintiffs assert that the names and duty station information of government personnel can be used, *inter alia*, to uncover government wrongdoing, to show how much government work is being done in a given location based on the number of employees at that location, or to reveal a high level of turnover at a particular agency.  The link between the disclosure of the names and duty station of these federal employees - - which reveals nothing directly about an employee's job function or the agency he or she works for - - and the conduct of the ATF, DEA, Secret Service, U.S. Mint, DOD, or the federal agencies which employ individuals in General National Resources &

_____

Robert Port, Senior Editor for Investigations at the Albany Times Union and adjunct professor at the Columbia University Graduate School of Journalism, also submitted a declaration outlining the important role information he has received from TRAC has played in reporting on government activities and uncovering unethical or illegal activities by government officials.

Biological Science (DHS only), Plant Protection and Quarantine, Hearings and Appeals, and

Border Patrol Agent occupations, is too attenuated to weigh in favor of disclosure.  *See Federal*

*Labor Relations Auth. v. United States Dep't of Veterans Affairs*, 958 F.2d at 512 ("while it may

be true that the list might provide names that a curious reporter could use in finding out what the

government is up to, we have already rejected a similar argument" based on the attenuated link

between personal information and an agency's activities basis); *Center for Public Integrity*, 2006

WL 3498089 at *5 (finding the link between the names and duty stations of various federal

employees and the "potential illumination of agency action" "too attenuated").

Finally, an employee's name and duty station are personal in nature and do not relate to

the employee's performance of public duties, thus the information would reveal little about job

function and weighs against disclosure.  *See Perlman*, 312 F.3d at 108 ("This factor is related to

the government activity factor because the purpose of FOIA is to shed light on public rather than

private activity . . . .  [T]he disclosed information must relate to the employee's performance of

his public duties.").

Each of the above factors weighs against disclosure.  Thus, the employees' privacy

interest in the nondisclosure of their names and duty stations outweigh the public interest in

disclosure.  Accordingly, defendant is entitled to summary judgment on this claim as it relates to

the employees engaged in General National Resources & Biological Science (DHS only), Plant

Protection and Quarantine, Hearings and Appeals, and Border Patrol Agent occupations, or who

work for the ATF, DEA, Secret Service, U.S. Mint, or DOD.[10]

As discussed, OPM failed to provide a reasonably detailed declaration explaining why it is

withholding the names and duty stations of employees engaged in twenty other "sensitive"

---

[10] Having concluded that OPM properly withheld the names and duty stations of DOD employees
under Exemption 3, the Court need not reach OPM's arguments regarding the applicability of
Exemption 3.

occupations.  In view of the potential threat to the privacy interests of these employees, the Court directs OPM to file supplemental declarations detailing the reasons why disclosure threatens the privacy interests of employees engaged in each of the remaining twenty occupations.  *See King v. United States Dep't of Justice*, 830 F.2d 210, 225 (2d Cir. 1987).

## 2.    IRS – Pseudonyms and Total Awards

### a.    Pseudonyms

Plaintiffs seek the true names of 666 IRS employees who had obtained pseudonyms prior to Congress's enactment of section 3706 of the IRS Restructuring and Reform Act of 1998 ("RRA"), 26 U.S.C. § 7804, which set forth a new standard for the assignment of pseudonyms by the IRS.[11]  According to Albert Adams, Chief, Disclosure, Office of Governmental Liaison and Disclosure, Internal Revenue Service, IRS employees who utilized pseudonyms prior to the enactment of the RRA were permitted to continue to use their pseudonyms without reapplying under the standard set forth in the RRA.  Second Adams Decl. ¶ 5.  Adams avers that prior to the enactment of the RRA, the IRS was obligated by contract and statute to permit IRS employees to adopt pseudonyms.[12]  *Id.* ¶ 4.  OPM argues that Congress could have, but did not, make 26 U.S.C. § 7804 apply retroactively to those IRS employees already using pseudonyms.  According to Adams, the IRS has determined "with respect to all IRS employees using pseudonyms . . . and whose true names were withheld pursuant to Exemption 6, that these individuals' very strong privacy interests outweighed the nearly non-existent public interest in their identities."  Second Adams Decl. ¶ 5.  Plaintiffs assert that the IRS has failed to show these employees were at

---

[11] Plaintiffs do not challenge OPM's decision to withhold the names of those IRS employees who obtained pseudonyms pursuant to the procedures set forth in the RRA.

[12] IRS employees who obtained pseudonyms prior to the enactment of the RRA, did so pursuant to a decision by the Federal Service Impasses Panel that was issued requiring the IRS to adopt the National Treasury Employees Union's position that IRS employees should be able to use pseudonyms.  *Dep't of the Treasury, IRS, Washington DC and NTEU*, 91 FSIP 229, 92 FLRR1-6512 (March 10, 1992), available at http://www.flra.gov/fsip/finalact/91fs_229.html.

particularized risk of harassment or attack or identify any other ground upon which these employees' names are exempt from disclosure.

In this case, it is undisputed that the 666 IRS employees who use pseudonyms have done so for more than 15 years as the result of a decision of the Federal Service Impasses Panel. Thus, these individuals have more than a *de minimis* privacy interest in the disclosure of their identities. There is no evidence suggesting that disclosure of the identities of 666 IRS employees, who have been using pseudonyms for at least 15 years, "would serve the core purpose of the FOIA, which is 'contribut[ing] significantly to public understanding of the operations or activities of the government.'" *Federal Labor Relations Authority*, 510 U.S. at 495 (quoting *Reporters Committee*, 489 U.S. at 775). Accordingly, the Court concludes that the IRS employees' privacy interest in the nondisclosure of their identities which have been secret for more than 15 years outweighs the public interest in disclosure of their names, and that disclosure would constitute a "clearly unwarranted invasion of personal privacy" under Exemption 6. 5 U.S.C. § 552(b)(6).

### b.  Total Award

Pursuant to Exemption 6, OPM also withheld the award dollar amounts for certain IRS employees who receive monetary awards issued under the "IRS-NTEU National Performance Award Agreement" on the basis that because the disclosure of the amount of an individual employee's award would enable anyone to compute that employee's performance appraisal score. Adams explains that:

> Awards issued under this program are governed solely by a mathematical formula based entirely upon an objective set of criteria, consisting of the employee's (publicly available) grade, the (publicly available) dollar amount "pool share" for the employee's individual work unit and the employee's average score on the critical job elements of his or her annual performance appraisal. The award is computed by multiplying these three factors together to arrive at a specific award dollar amount. As each employee's grade and the pool share for each employee's work unit are publicly available, the disclosure of the amount of an individual employee's award

would enable anyone to compute the employee's average score on his/her performance appraisal.

Adams Decl. ¶ 11.

Plaintiffs contend that they cannot "reverse-engineer" an IRS employee's performance appraisal score based on the information in the "Total Award" field because the CPDF files contain a field labeled "Total Award" which contains the sum of all rewards an employee received that quarter and do not itemize "individual award amounts".  Moreover, plaintiffs assert, OPM's CPDF system includes sixteen types of awards, of which, performance awards are only one type, and does not specify which type of award is set forth in the CPDF files.  Long Decl. ¶48.b.  Thus, plaintiffs argue, without more information, there is no way to know which awards in the "Total Award" field are performance-based.

Adams states, in response, that only a small percentage of IRS employees receive more than one award in a quarter and that by comparing the award amounts of all of these employees, it is "eas[y] to discern which amount reflects an appraisal based award and which amount contain additional awards."  Second Adams Decl. ¶ 6.  Further, "[b]y comparing the award amounts of all bargaining unit employees, one could easily discern the large percentage of bonus amounts that reflect only an appraisal based award and which bonuses also contained an additional award."  *Id*.  Adams does not, however, address plaintiffs' assertion that it is impossible to determine which awards in the "Total Award" field are performance-based because there are sixteen types of awards, only one of which is performance-based and the CPDF system does not distinguish between types of awards.  Thus, while numerous courts have held that release of favorable or unfavorable information regarding an employee's job performance, such as the receipt of an award, financial bonus, or a particular rating after an evaluation, constitutes more than a *de minimis* invasion of privacy because the information contains personal information about job

performance, *see Warren v. Social Security Admin.*, No. 98-CV-0116E (SC), 2000 WL 1209383, at *4 (W.D.N.Y. Aug. 22, 2000) ("[A]ward nominations represent intensely private information in one's personnel file, and accordingly . . . these documents are within Exemption 6 of the FOIA."), *aff'd in relevant part, remanded on other grounds*, 2001 WL 514312 (2d Cir. May 15, 2001); *Federal Labor Relations Auth. v. United States Dep't of Commerce*, 962 F.2d 1055, 1059 (D.C.Cir. 1992) (Employees receiving "outstanding or commendable ratings have a substantial interest in maintaining the privacy of their evaluations" and the fact that they are favorable "does not diminish the interest."), the facts before the Court are in dispute.  Defendant's declarations do not contain enough detail on this issue and therefore not entitled to deference.  Accordingly, defendant is directed to submit additional evidence on this issue. *See King*, 830 F.2d at 225.

### E.   Organizational Component and Redactions

#### 1.   Organizational Component

Plaintiffs seek an order directing OPM to disclose the organizational component field from the CPDF.  Long states that plaintiffs did not know OPM had been withholding the organizational component field until September 19, 2006, when OPM provided CPDF files that included "a field, 'Organizational Component,' that had not been provided in any of the previous copies of these CPDF files."  Long Decl. ¶ 17.  Plaintiffs assert this is also evidence of defendant's failure to mark redactions properly in the files it has disclosed.  The organizational component describes the particular activities and responsibilities at the government office where the federal employee works.  Defendant claims plaintiffs never raised the issue of OPM's failure to disclose the organizational component in any administrative proceeding and therefore failed to exhaust their administrative remedies with respect to that claim.  Plaintiffs, in response, assert that if OPM's position "is that the additional records and all fields in the CPDF except the 47 for which OPM released records on at least some employees are not within the scope of the request

(and hence of this case), plaintiffs are willing to file new requests for them, in hopes that in its response to those requests, OPM will follow FOIA's requirements that redactions be properly indicated." Plaintiffs' Reply Mem. of Law, p. 10. Because of both parties' confusion regarding this issue summary judgment would be inappropriate at this point, and the parties are directed to file further briefing clarifying their positions on this issue.

### 2.   Redactions

Plaintiffs move for summary judgment on their claim that OPM failed to comply with 5 U.S.C. § 552(b) which requires that when records are redacted, "the amount of information deleted shall be indicated on the released portion of the record". The parties dispute whether OPM has complied with its obligation to indicate the amount of information it deleted on the records it released to plaintiffs. Defendants claim that plaintiffs have not exhausted their administrative remedies with respect to this claim. Plaintiffs assert that they are only seeking to compel OPM to comply with the administrative appeal decision dated March 28, 2006, in which OPM agreed that plaintiffs were entitled to "an indication of the redacted information on the released portions" of the June and September 2005 CPDF files. Lukowski Decl., Ex. P. The records plaintiffs refer to are records defendants provided after the commencement of this action and during the course of the filing of the motions for summary judgment. Defendants request that in the event the Court "deems it necessary" to reach this issue, it permit defendant to provide further briefing. In view of the disclosure of new CPDF files to plaintiffs, plaintiffs' own request for the right to raise further issues with respect to the voluminous files it received from OPM in September and December 2006, and the Court's direction to OPM to file a more detailed affidavit, *supra*, the Court will reserve and permit the parties to file additional briefing on the issue of whether OPM properly marked redactions in the records it provided to plaintiffs.

## V.   CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion for summary judgment is granted to the extent defendant seeks dismissal of plaintiffs' FOIA claims in connection with its decision to withhold information regarding employees engaged in General National Resources & Biological Science (DHS only), Plant Protection and Quarantine, Hearings and Appeals, and Border Patrol Agent occupations, or who work for the ATF, DEA, Secret Service, U.S. Mint, or DOD; and its decision to withhold the real names of IRS employees using pseudonyms; and it is further

**ORDERED** that defendant's motion for summary judgment is otherwise DENIED; and it is further

**ORDERED** that plaintiffs' motion for summary judgment is DENIED; and it is further

**ORDERED** that defendant submit supplemental *Vaughn* declarations in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED** that the parties submit additional briefs in accordance with this Memorandum-Decision and Order;[13] and it is further

**ORDERED** that United States Magistrate Judge David E. Peebles is directed to hold a conference to establish a scheduling order for the submission of the supplemental *Vaughn* declarations and additional briefs, and/or new motions for summary judgment.

**IT IS SO ORDERED.**

Dated: September 30, 2007

_____

Norman A. Mordue
Chief United States District Court Judge

---

[13] The Court notes plaintiffs argue, in a footnote, that the Court "should require to segregate and release the code that indicates just that employees are not in a locality requiring special pay", Plantiffs' Mem. of Law, p. 21, n.9. The Court does not reach plaintiffs' argument regarding Locality Pay Area in view of its assertion in a footnote. If plaintiffs raise the issue in future briefing, they are directed to do so in the body of any submissions.