**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SUSAN B. LONG and DAVID BURNHAM,**

                     **Plaintiffs,**          **5:05-CV-1522**
                                         **(NAM/DEP)**

      **vs.**

**OFFICE OF PERSONNEL MANAGEMENT,**

                     **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

Public Citizen Litigation Group        Adina H. Rosenbaum, Esq.
1600 20th Street NW                  Scott Nelson, Esq.
Washington, DC 20009
_Attorneys for Plaintiffs_

U.S. Department of Justice           James Jules Schwartz,
Civil Division                        Trial Attorney
20 Massachusetts Avenue NW
P.O. Box 883 Ben Franklin Station
Washington, DC 20044

Richard Hartunian                   William H. Pease,
United States Attorney             Assistant United States Attorney
100 South Clinton Street
Syracuse, NY 13261-7198
_Attorney for Defendant_

**Hon. Norman A. Mordue, Chief Judge:**

**MEMORANDUM DECISION AND ORDER**

**I.**       **INTRODUCTION**

      Plaintiffs Susan B. Long and David Burnham, co-directors of the Transactional Records

Access Clearinghouse ("TRAC"), a data gathering, research, and distribution organization

1

associated with Syracuse University, brought this action pursuant to the Freedom of Information

Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of: the names and duty station information of

all employees in the United States Department of Defense ("DOD"), the Drug Enforcement

Agency ("DEA"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the U.S.

Mint, the Secret Service; the names and duty station information of employees engaged in

"sensitive" occupations; bargaining units for DOD personnel; and award dollar amounts for

various Internal Revenue Service ("IRS") employees.  This information is contained in the

Central Personnel Data File ("CPDF"),[1] which is maintained by defendant Office of Personnel

Management ("OPM").

        In a Memorandum Decision and Order dated September 30, 2007, the Court held that the

name and duty station information of employees engaged in General National Resources &

Biological Science, Plant Protection and Quarantine, Hearings and Appeals, and Border Patrol

Agent occupations, or who work for the ATF, DEA, Secret Service, U.S. Mint, or DOD, and the

names of IRS employees using pseudonyms, were personnel[2] files, the disclosure of which would

be a "clearly unwarranted invasion of personal privacy", and therefore could be withheld by OPM

_____

        [1]The CPDF is a government wide database which contains information regarding the
federal civilian workforce.  The CPDF covers all federal civilian employees of the Executive
Branch and some employees of the Legislative Branch, but does not cover employees of the
Judicial Branch.  From the information federal agencies submit, OPM builds four major
databases: (1) status - an individual record of the status of each active employee as of the end of
the fiscal quarter; (2) dynamics - a record of all personnel actions occurring during the fiscal
quarter; (3) longitudinal history - extracts from dynamics files structured for trend analyses; and
(4) organizational component code translation - the codes, titles, and hierarchical relationships
for organizations within an agency.

        [2]As plaintiffs correctly point out, they agreed these were "similar" files, not that they
were "personnel" files.  Accordingly, the Court hereby amends its prior Memorandum Decision
and Order to so reflect.

under Exemption 6 to FOIA.  5 U.S.C. § 552(b)(2).  Accordingly, the Court granted defendant's

motion for summary judgment dismissing plaintiffs' FOIA claims in connection with those files.

However, with respect to the name and duty station information for employees engaged in the

twenty other occupations OPM deemed "sensitive", and the IRS award amounts, the Court found

that the evidence OPM relied upon  was insufficient to show disclosure "clearly unwarranted"

under Exemption 6.  Additionally, plaintiffs indicated in their submissions that they required

additional time, due to OPM's late disclosure of certain records, to address OPM's withholding of

"organizational component codes".  For these reasons, the Court denied the balance of the parties'

motions for summary judgment and directed the parties to file additional briefs and/or new

motions for summary judgment on these issues.  Presently before the Court are OPM's second

motion for summary judgment and plaintiffs' second cross-motion for summary judgment (Dkt.

No. 15).

## II.   EVIDENCE

Familiarity with the facts regarding the circumstances out of which this action arose, as

well as those facts material to resolution of the prior motion for summary judgment, is assumed.[3]

---

[3]For more than a decade, plaintiffs have, through FOIA, obtained copies of records from
the CPDF.  Plaintiffs use the information to provide "the American people - and institutions of
oversight such as Congress, news organizations, public interest groups, businesses, scholars, and
lawyers - with comprehensive information about federal staffing, spending, and the enforcement
activities of the federal government."  Am. Complaint. ¶ 4. On October 8, 2004, Long, on behalf
of TRAC, sent OPM a FOIA request for a copy of the "Status File" and "Dynamics File" for the
March 2004 CPDF database.  Lukowski Decl., Ex. A.  In a letter dated November 23, 2004,
Gary Lukowski, Manager of Workforce Information and Planning within the Strategic Human
Resources Policy Office in OPM, acknowledged Long's FOIA request and advised that OPM
was reviewing its policy on disclosure of individual employee records as it related to the FOIA
and the Privacy Act.  *Id*. Ex. B.  In a letter to OPM dated February 4, 2005, Long requested
"Status and Dynamic Files" for the June and September 2004 CPDF as well as a copy of OPM's
"newly implemented data release policy".  *Id*. Ex. F.
    On April 15, 2005, OPM produced records from the March, June, and September 2004

CPDF files. *Id*. Ex. I. On June 13, 2005, Long requested, and on August 23, 2005, OPM produced, the "Status and Dynamic Files" for the March 2005 CPDF. *Id*. Exs. K, L. Unlike previous CPDF files plaintiffs had received, however, these files did not include any DOD employee records. *Id*. Ex. L. In letters accompanying the CPDF files from OPM, Lukowski informed plaintiffs that OPM had excluded DOD employees from the files, and that plaintiffs should contact the DOD directly to obtain "Defense data". *Id*. According to plaintiffs, OPM, without explanation, also redacted names and most duty station information for more than 150,000 other government employees. Long Decl. ¶ 7. Plaintiffs commenced this action on December 5, 2005. Dkt. no. 1. The parties, however, continued to correspond: plaintiffs submitted further FOIA requests, and OPM provided responses to the new requests as well as new copies of CPDF files in response to plaintiffs' prior FOIA requests.

On January 25, 2006, plaintiffs requested from OPM the "Status and Dynamics files" for the June and September 2005 CPDF. Lukowski Decl. Ex. M. OPM produced these files on February 22, 2006. *Id*. Ex. N. According to plaintiffs, OPM redacted these files, too, omitting all records on DOD employees, the names of all IRS employees, duty station information for approximately 23,000 IRS employees, and name and duty station information for approximately 139,000 employees in other federal agencies. Long Decl. ¶ 8. In a letter accompanying these files, Lukowski explained that the "data elements" for employees in occupations related to national security were "masked." Lukowski Decl., Ex. N.

In a letter dated February 24, 2006, plaintiffs notified OPM that they were appealing OPM's withholding of information from the June and September 2005 CPDF files. *Id*. Ex. O. In a letter dated March 28, 2006, Kathie Ann Whipple, Acting General Counsel for OPM, denied plaintiffs' appeal. *Id*. Ex.P. Whipple explained that OPM withheld the information of employees in sensitive occupations on personal privacy grounds pursuant to Exemption 6. *Id*. Whipple advised plaintiffs that OPM had referred their FOIA request to the DOD and the IRS in accordance with OPM's agreements with those agencies. *Id*. Plaintiffs filed an amended complaint in this action on April 13, 2006. Dkt. no. 9.

On June 6, 2006 and September 19, 2006, OPM gave plaintiffs revised copies of the March, June, and September 2004 and 2005 CPDF files. OPM, however, continued to redact the names and specific duty station information for all employees of the DEA, ATF, U.S. Mint, and Secret Service or who worked in any of the 24 occupations OPM deemed sensitive. Long Decl. ¶ 11. According to plaintiffs, OPM also redacted the names and/or duty stations of 908 federal employees who neither worked for the above enumerated agencies nor in any of the 24 occupations OPM deemed sensitive. Long Decl. ¶ 14. Lukowski responded that OPM redacted the names and/or duty stations of these particular employees because they worked either in a "sensitive occupation" or for the DEA, ATF, U.S. Mint, or Secret Service "at any point during the requested period". Second Lukowski Decl. ¶ 5. The IRS and OPM also provided plaintiffs with new copies of the March, June and September 2005 CPDF records regarding IRS employees which included the names of all employees except those who were employed in "sensitive" occupations or in the IRS's Registered Pseudonym Program. Long Decl. ¶ 12. Additionally, the IRS withheld the dollar amounts of the "Total Awards" for some of its employees on the ground that the award amounts could be used to calculate an employee's performance rating. Second Adams Decl. ¶ 6.

4

In support of its second motion for summary judgment, OPM submitted two declarations by Gary Lukowski, Manager of Workforce Information and Planning within the Strategic Human Resources Policy Office in the Office of Personnel Management and a declaration by Janet Miner, Chief, Disclosure, Office of Governmental Liaison and Disclosure, Internal Revenue Service.  In opposition to OPM's motion and in support of their cross-motion for summary judgment, plaintiffs submitted two declarations by plaintiff Susan Long, with exhibits, and a declaration by Henry Ruth, who, during his legal career, "served for many years in federal, state, and local law-enforcement capacities".

    **A.**    **Name and Duty Station - "Sensitive" Occupations**

          **1.**    **Lukowski Declarations**

In his third declaration, Lukowski states that OPM withheld name and duty station information regarding employees in the following "sensitive" occupations: correctional officer, United States Marshal, police, nuclear materials courier, intelligence, intelligence clerk/aide,

---

Long stated that:

> The CPDF files provided to us on September 19, 2006, also included a field, "Organizational Component," that had not been provided in any of the previous copies of these CPDF files. OPM had not informed us in its responses to our FOIA requests that it was withholding Organizational Component, had not mentioned the field in its *Vaughn* Index, and had not marked the field as redacted on the previously released files . . . .  OPM redacted Organizational Component for ATF, DEA, U.S. Mint, Secret Service, and Federal Bureau of Investigations employees, as well as for employees in the 24 occupations OPM labels "sensitive." In addition, OPM did not provide organizational component for any DOD employees. It also withheld organizational component for hundreds of other non-DOD employees without providing an explanation for those redactions.

Long Decl. ¶¶ 16-17.

internal revenue agent, nuclear engineering, internal revenue officer, general inspection, investigation and compliance, compliance inspection and support, general investigating, criminal investigating, game law enforcement, immigration inspection, alcohol, tobacco, and firearms inspection, customs and border interdiction, custom patrol officer, customs inspection, customs and border protection.  Lukowski notes that plaintiffs seek "massive electronic lists of personal information regarding individuals in these occupations" and asserts that "[t]he privacy of these individuals is the highest when the request seeks comprehensive lists of personal information regarding individuals in these occupations" because the "electronic format . . . easily lends itself to searches for potential targets".  Further, and in addition to addressing specifically why OPM deemed each occupation at issue "sensitive", Lukowski explains:

> In consideration of the extremely sensitive nature of the occupations listed here, OPM determined that individuals and their families were exposed to an increased risk of being targeted for attack and harassment by international and domestic terrorists, foreign powers, violent criminals, and criminal organizations.  These organizations and individuals could target any of the employees in sensitive occupations or their families as a means of degrading their ability to perform in their jobs or to vent misplaced frustrations against their agencies or the U.S. Government.  Therefore, OPM concluded that all individuals in these occupations have an extremely strong privacy interest in their identities and duty station location information that heavily outweighs the virtually non-existent public interest in this information, and that this information should be protected under Exemption 6 of the Freedom of Information Act, and I protected this information accordingly.

3d Lukowski Decl. ¶ 23.

### a.    Correctional Officer

In his declaration Lukowski states that revealing the names and locations of correctional officers "potentially compromises the ability of the Bureau of Prisons to run a safe and effective correctional environment as it exposes officers to a greater risk of being pressured to commit illegal acts under duress (e.g. bringing in contraband, arranging for an escape, operating an

6

outside criminal enterprise)."  3d Lukowski Decl. ¶ 3.  Lukowski further states that disclosure of names or duty stations of correctional officers would "unduly place[] them and their families at heightened risk of harassment or attack".  *Id.*

### b.    U.S. Marshals

Lukowski states that "[d]isclosing names and duty station locations of Marshals could compromise the ability of the Federal government to serve effective process and handle that aspect of the law enforcement system."  *Id.* at ¶ 4.  Lukowski further states that disclosure would compromise "the safety of Marshals and their families because Marshals perform undercover or sting operations where concealment of identity is essential."  *Id.*

According to Lukowski, "only administrative heads and political appointees are identified [on websites].  Agents and officers are routinely not named as a group or in total.  For example, the names of U.S. Marshals are not listed on the [web]site.  Only the district Marshal - the most high profile and the administrative/managing/political officer - is listed; other marshals are not listed."  2d Lukoski Decl. ¶ 4.

### c.    Police

Lukowski states that disclosing the names and duty stations of federal police officers would compromise "the ability of the Federal government to conduct investigations and make arrests in matters of national concern," and would reveal "areas where investigations may be concentrated."  *Id.* at ¶ 5.  According to Lukowski, disclosure of the identity of federal police officers would place "them and their families at heightened risk of harassment or attack as it may lead to persecution and revenge by persons or members of gangs and organized crime who have had adverse interactions with these employees."  *Id.*

### d.  Nuclear Materials Courier

Lukowski states that individuals employed in the occupation of nuclear materials courier are more susceptible to harassment or attack if their names and duty stations are disclosed because the sensitive nature of the jobs.  According to Lukowski, a nuclear materials courier performs vehicle operations, armed escort, communications and security equipment operations, and related work designed for, and peculiar to, the safe and secure transport of highly sensitive nuclear materials."  4th Lukowski Decl. ¶ 6.

### e.  Nuclear Engineering

Lukowski states that nuclear engineers are involved in a variety of projects and programs such as:

> reactor operations, fuel cycle management program, fuel and fuel rod development, control of manufacturing, repair, or maintenance processes, licensing, safety, inspection and incident analysis, compliance with standards or contract provisions, design, instrumentation, and test operations, transportation and storage of radioactive materials and waste, and engineering staff or program responsibilities carried out in a research and development organization.

*Id*. at ¶ 10.  Lukowski states that federal nuclear engineers "have intimate knowledge of nuclear principles and existing systems."  *Id*.  Based on the nature of their jobs, Lukowski explains, nuclear engineers are more susceptible to harassment or attack if their names and duty stations are disclosed.

### f.  Intelligence and Intelligence Clerk/Aide

Lukowski explains that OPM withheld the names and duty stations of employees engaged in the intelligence and intelligence clerk/aid occupations because these individuals are empowered with, or provide support to those who are empowered with, the collection of sensitive information that affects national security and national security policy.  3d Lukowski Decl. ¶¶ 7-8.

8

### g.     Internal Revenue Agent and Internal Revenue Officer

According to Lukowski, IRS Agents "determine or advise on liability for Federal taxes" and "conduct independent on-site examinations of the Federal income tax returns of individuals, businesses, corporations, and other entities to determine correct tax liabilities."  3d Lukowski Decl. ¶ 9.  Lukowski states that individuals employed as IRS officers "are empowered with activities relating to the collection of delinquent taxes."  3d Lukowski Decl. ¶ 11.  In the performance of their duties, IRS officers "routinely deal with fearful, hostile, and defensive individuals and organizations".  *Id*.  Based on their occupations, Lukowski states that the disclosure of the names and locations of these individuals could place them "at risk of attack or harassment by persons who may seek to exact revenge based upon collection activities or seeking to vent misplaced frustrations."  *Id*. at ¶¶ 9, 11.  Lukowski further states that "[u]nder agreement with the IRS and Department of Treasury, based on the IRS's Registered Pseudonym Program, OPM does not release name and duty station of any IRS employee."  *Id*.

### h.     General Inspection, Investigation, and Compliance and Compliance Inspection and Support

Lukowski states that these occupations include "positions that perform or supervise inspection or technical support work in assuring compliance with or enforcement of Federal law, regulations, or other mandatory guidelines that are not classifiable to another, more specific, occupational series."  3d Lukowski Decl. ¶¶ 12, 13.  According to Lukowski, individuals employed in these occupations are located within the departments of Homeland Security and Justice, and centered in the FBI, ATF, and DEA, agencies "which have historically either NOT provided certain information to OPM or have had information redacted upon release."  *Id*.

9

Disclosure of their identities "places them and their families at heightened risk of harassment or attack". *Id*.

Lukowski states that prior to September 2005, there were only four airport screeners employed by the Transportation Security Administration and their records were protected. Post 2005, however, over 51,000 individuals were classified into the same category as the four screeners, and consequently OPM has protected their records as well. 4th Lukowski Decl. ¶ 14.

### i.   General Investigating

Lukowski states that the occupation entitled general investigating "includes positions that involve planning and conducting investigations covering the character, practices, suitability or qualifications of persons or organizations seeking, claiming, or receiving Federal benefits, permits, or employment when the results of the investigation are used to make or invoke administrative judgments, sanctions, or penalties." 3d Lukowski Decl. ¶ 14. Individuals employed in this occupation are "concentrated" at OPM and the Equal Employment Opportunity Commission. *Id*. Lukowski explains that because "they are often responsible for investigating individuals and particularly sensitive situations, disclosure of their locations and identities places them and their families at heightened risk of harassment and attack from individuals seeking to undermine or disrupt the investigations or who were unhappy with the outcome of their investigation and wish to target the investigators or their families in retaliation." *Id*.

Lukowski further explains that "a large number of positions are indeed sensitive (not just one)" and "it is imperative to protect all those employees". According to Lukowski:

> [t]he only way to do this effectively is to label the entire series as sensitive. It is not feasible or effective to attempt to identify each and every individual position that is sensitive versus those that are not. In addition, there is no way to identify which

10

positions or individuals that are not currently performing sensitive duties might be assigned sensitive duties at a future date.

4th Lukowski Decl. ¶ 4.

### j.  Game Law Enforcement

Lukowski states that individuals employed in the occupation of game law enforcement "were located in the Department of the Interior's Fish and Wildlife Service, but were reclassified" in 2003.  3d Lukowski Decl. ¶ 16.  According to Lukowski, "[t]his series is being considered for cancellation. "  *Id.*  Lukowski states that, presently, these individuals are in the Departments of Defense and Commerce.  *Id.*

In his fourth declaration, Lukowski states that "[p]ersons in this series have enforcement responsibilities."  4th Lukowski Decl. ¶ 11. Lukowski states that individuals employed in Game Law Enforcement work in close coordination with multiple state and Federal agencies to enforce the laws protecting living marine resources."  *Id.* at ¶ 11.  Lukowski avers that these officers are involved in the "extremely hazardous" activity of "conducting surveillance and boarding vessels". *Id.* at ¶ 11.  These individuals also work with the United States Coast Guard and the Department of Homeland Security.  *Id.*

Lukowski further explains regarding the potential for cancellation of the series that the "work performed by persons in this series will be re-classified into a new series . . . and will still continue to perform the law enforcement functions they carry out now."  *Id.*

### k.  Alcohol, Tobacco, and Firearms Inspection

Lukowski states that this occupational "series includes positions concerned with work involving the qualification and inspection of establishments engaged in the production or use of alcohol or tobacco products; the assurance of full collection of revenue on alcohol and tobacco

11

products; the development and interpretation of regulations applicable to such establishments; and

the development, analysis, and improvement of programs, procedures, and techniques for

regulating establishments involved in producing and using alcohol and tobacco products." 3d

Lukowski Decl. ¶ 18.  ATF employees work in the Departments of Justice and Treasury.  *Id.*

Further:

> Persons in this series can frequently face hostile situations which endanger them
> personally and which could potentially interfere with their Federal duties.
> Investigative work is of particularly sensitive nature and requires undercover and
> sting operations in which employees' identities must not be revealed.  Employees deal
> with gang members and individuals associated with national or international
> organized crime.  Disclosure of their identity places them and their families at
> heightened risk of harassment or attack.

*Id.*

## l.  Customs and Border Interdiction, Custom Patrol Officer, Customs Inspection, and Customs and Border Protection

Customs and border interdiction employees are tasked "to detect, interdict, apprehend and

prevent terrorists and other persons, weapons and contraband, from illegally entering or attacking

the United States".  3d Lukowski Decl. ¶ 19.  Lukowski states that the custom patrol officer series

was reclassified to border patrol agent.  *Id.* at ¶ 20.  Lukowski states that these "individuals

maintain an active presence within border communities as a deterrent to ongoing illegal activities,

and apprehend violators of Department of Homeland Security/ Customs and Border Protection

laws at and around the nation's borders."  *Id.*  Persons engaged in customs inspection "are

responsible for checking for contraband and illegal items entering the United States."  *Id.* at ¶ 21.

Customs and border protection officers "deal with large numbers of people and nationalities . . .

presenting themselves for entry and the import of export of merchandise into the United States."

*Id.* at ¶ 22.  "They also prevent departure of certain aliens, unreported currency, and individuals

wanted by federal, state and local authorities; address threats to border security and global trade posed by potential for concealment of weapons of mass destructions or terrorist courses of action in U.S.-bound sea containers." *Id*. According to Lukowski, based on the sensitive nature of their employment, disclosing the names and duty stations of these individuals places them at greater risk of "harassment of attack". *Id*. at ¶¶19-22.

Lukowski states that individuals employed in Customs Patrol Officer, Customs Inspection, and Customs and Border Protection occupations, "have a wide variety of sensitive responsibilities concerned with the protection of our country's borders from criminals, terrorists, and other[s] . . . seeking to enter illegally or bring in illegal contraband or weapons". *Id*. at ¶ 10.

### 2.      Long Declarations

In opposition to defendant's motion and in support of their cross-motion regarding the disclosure of the names and duty stations of employees in "sensitive" occupations, plaintiffs submitted two declarations by plaintiff Long.

### a.      Correctional Officer, U.S. Marshal, and Police

In her declaration, Long states that law enforcement officials "generally wear name-tags" and prisoners "tend to know the names of their wardens and the other correctional officers supervising them." 3d Long Decl. ¶ 16. Long further states that many of the names of these federal law enforcement officers are available on the Internet, and that through their own searches, they obtained the names of the United States Marshal for the Northern District of New York and the warden at Federal Correctional Institute Ray Brook. *Id*. at ¶ 17. With regard to the "police", Long states that employees in this occupational series can be found in a "variety of federal agencies" including, *inter alia*, the National Institute of Standards and Technology, the

13

Office of the Secretary in the Department of Commerce, and the Bureau of Reclamation.  3d Long Decl. ¶¶ 10, 11.

### b.    Intelligence and Intelligence Clerk/Aide

Long avers in her declaration that employees in the "Intelligence" occupational series "can be found in such diverse agencies as the Forest Service, the Bureau of Export Administration, the Department of Energy, the Bureau of Citizenship and Immigration Services, the Centers for disease Control and Prevention, the Bureau of Reclamation, and the U.S. Fish and Wildlife Service, along with 105 other agencies."  3d Long Decl. ¶ 10.  Long further avers that because the "Intelligence" occupational series covers " broad range of responsibilities", disclosure of employees within this series would not, for example, indicate "which ones (if any) were working on Chinese social trends . . . Russian military trends, and . . . American geographic trends."  3d Long Decl. ¶ 13.

### c.    IRS Agent and IRS Officer

In her declaration, Long quotes Congress's determination that "'any manually generated correspondence received by a taxpayer from the [IRS] shall include in a prominent manner the name, telephone number, and unique identifying number of an Internal Revenue Service employee the taxpayer may contact with respect to the correspondence,' and that 'an [IRS] employee shall give a taxpayer during a telephone or personal contact the employee's name and unique identifying number'".  3d Long Decl. ¶ 16.  Long asserts that "the public already has the names of the IRS employees with whom it had contact and does not need to get those names from the CPDF."  4th Long Decl. ¶ 10.

### d.    General Inspection, Investigation, and Compliance, Compliance Inspection and Support, and General Investigating

14

Long pointed out in her declaration that employees in the occupational series "Criminal Investigating" "can be found, to cite just a few illustrative examples, in the Corp for National and community Service, the Agency for International Development, . . . and the National Gallery of Art" along with more than "64 other agencies", "which are not law-enforcement or intelligence agencies."  3d Long Decl. ¶ 10.

Long took issue with Lukowski's statement that the CPDF files it sent in September 2005indicated that there were more than 51,000 employees in the occupational series "Compliance Inspection and Support (1802)".  Long asserts that the "CPDF files we received there were 6,368 employees in this occupational series".  *Id*. at ¶ 14.  Long further states that "only 3,100 were in the Department of Homeland Security (DHS), not 49,000+."  *Id*. at ¶ 14. "Also, more than twice as many employees in this series were in non-DHS, non-Department of Justice agencies than indicated by Lukowski."  *Id*.  Long additionally asserts that "despite Lukowski's claims that the DHS employees in this occupational series are airport screeners, only 4 of them were in the Transportation Security Administration, the component of DHS that conducts security screening at airports."  *Id*.

> **e.      Customs and Border Interdiction, Custom Patrol Officer, Customs Inspection, and Customs and Border Protection**

According to Long, "[n]o positions were classified under the occupational series 'Customs and Border Interdiction' . . . in the CPDF for any of [the] time periods covered by this lawsuit." 3d Long Decl. ¶ 15.

> **f.      Occupational Series**

In her declaration, Long explains that according to the OPM Handbook, the "occupations" OPM deems sensitive are "occupational series" or positions which are "'similar to each other

15

with regard to subject matter and basic knowledge and skill requirements.'" 3d Long Decl. ¶ 7 (quoting OPM, Handbook of Occupational Groups and Series, at 4).  Long states that these "[s]eries 'include all positions at various grade levels in that particular kind of work.'"  *Id.* (quoting OPM, Handbook of Occupational Groups and Series, at 4).

Long asserts that a position's "grade level" may impact an employee's job assignment and that any occupational series may include "lower grades" which may be classified as "clerical workers".  *Id.* at ¶ 8.  Thus, Long states "even for the same occupational series, the work assigned to positions may differ substantially from one agency to the next.  The occupations for which OPM withheld names and duty-station information exist in numerous agencies, many of which are not law-enforcement or intelligence agencies " such as the Government Printing Office, the National Gallery of Art, the Forest Service, the Centers for Disease Control and Prevention, the Bureau of Reclamation, and the U.S. Fish and Wildlife Service.  *Id.* at ¶ 10.

Long argues that "[b]ecause these so-called 'sensitive' occupational series are found in such a variety of federal agencies, OPM has redacted information from employee records in most federal agencies, which has a severe negative impact on TRAC's ability to conduct analyses of the federal workforce."  *Id.* at ¶ 11.

Long asserts that in light of the "broad range" of a responsibilities included in an occupational series "it is impossible to discern from an employee's occupation exactly what responsibilities that particular employee has.  Someone looking at the names and occupations in the CPDF file would therefore not know a particular employee's work assignment."  *Id.* at ¶ 13.

### 3.    Henry Ruth Declaration

Plaintiffs have also submitted a declaration by Henry Ruth, who, from 1957 to 2004, served in federal, state, and local law-enforcement capacities during his legal career and co-authored a book entitled "The Challenge of Crime: Rethinking Our Response". Ruth states that from his experiences, he has learned that law enforcement officials must earn and maintain the trust and respect of the public to do their jobs effectively. One way to do this, according to Ruth, is to have the police operate in an "open way." Ruth ¶ 3. Ruth states that "police in the United States, at every level of government, generally wear or display name tags or badges and identify themselves by name and their position when dealing in person or by phone or in correspondence with the public". *Id*. at ¶ 4. Ruth states that it "increases the public trust in law enforcement for the public to know, in general, who police officers are." *Id*. at ¶ 5.

### B.      Duty Station and Organizational Component Code

As stated, in addition to redacting the names of employees in "sensitive occupations", OPM redacted the core based statistical area ("CBSA"), combined statistical area ("CSA"), locality pay area ("LPA"), state, county, and city (collectively referred to as duty station), and organizational component code of each of these employees.

#### 1.      Lukowski Declarations

"The CBSA, CSA, and LPA are all generated using duty station location and are closely linked with a specific geographic location." 2d Lukowski Decl. ¶ 9(c). The CBSA is "a five character code containing a geographic area that has at least one urban area of population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties." 2d Lukowski Decl. ¶ 9(a). The CSA is a "a three character code consisting of two or more [CBSAs]." 2d Lukowski Decl. ¶ 9(b). The LPA is "a two character

code identifying an area for purposes of locality-based comparability payments." 2d Luk. Decl. ¶ 9(c).   An organizational component code "is an 18-character code that reflects the specific organization that employs an individual and in many cases also identifies the particular city and state, or city and country in which that organization is located." 2d Lukowski Decl. ¶ 11.   For example, "[u]sing the first 12 characters for Department of Justice codes beginning with DE such as 'DE5214201681' would identify 'Task Force (Charleston)' within the 'Columbia, SC District Office' within the 'Atlanta, GA Division' of the Drug Enforcement Agency." *Id.*

OPM withheld the duty station information and organizational component code "of all individuals in 'sensitive occupations' as well as those of all employees in the DEA, ATF, Secret Service, U.S. Mint, and FBI. *Id.* Lukowski explains that OPM withheld the organizational component codes because it recognized:

> the privacy concerns of the various federal employees in national security, homeland security, law enforcement or other sensitive occupations, who by virtue of their work or their agency's mission, are potentially put in harm's way. If information regarding the specific organizational component and its location are known, foreign or domestic terrorists could plan an attack designed to kill or injure individuals in specific types of sensitive occupations at their organization component location. These employees also are more vulnerable and likely to be exposed to harassment and unwarranted attention as a direct result of their work . . . .

*Id.* In his fourth declaration, Lukowski further explains that the:

> 18-character code not only reflects the specific organization that employs an individual, but in many cases it also identifies the particular city and state, or city and country in which that organization is located.  OPM decided that releasing the organization component code would make it relatively easy to locate specific Federal employees as the code lists low level organizational offices and often geographic location, and therefore I withheld the codes for reasons similar to withholding other data elements that reflect the location for employees . . . .  Obtaining either the duty station or organizational component (and especially the combination of both), in conjunction with all of the other data entries released to Plaintiffs, would facilitate the identification of thousands of employees in sensitive positions.

4th Lukowski Decl. ¶ 18.

More specifically, according to Lukowski, disclosure of the duty station and organizational component of employees in sensitive positions, would reveal the locations of these employees and: "disclose[] areas where investigations may be concentrated"; "demonstrate concentration of sensitive government activities"; "reveal concentrations of persons involved in [intelligence] activities and potentially compromise the ability of the Federal government to collect information relevant to national security"; "could potentially hamper the Federal government's tax collection activities"; "could unduly affect Federal activities of a sensitive nature"; "could compromise the effectiveness of Federal investigations and law enforcement activities of a sensitive nature", "would . . . identify geographic areas in which highly sensitive government operations [regarding customs and border interdiction] are being conducted. Those areas where border interdiction has not increased could be seen as "low risk" areas or entry points which could encourage people to attack or harass these individuals and their families"; "international terrorists or criminals trying to enter the country could use detailed location data to target Border patrol agents and their families for attack or harassment"; "identify areas where the presence of [customs inspection] employees is thin, thereby exposing potential entry points for the importation of items that could be used for illegal and destructive activities"; and "adversely affects the ability of the United States government to monitor and protect its borders and further places the persons conducting those activities and their families at greater risk of harassment or attack". 3d Lukowski Decl., ¶¶ 5, 6, 7, 9, 10, 11, 12, 13, 15, 19, 20, 21, 22.

    **2.  Long Declarations**

In her fourth declaration, Long contends that an employee's location and identity cannot be derived from the organizational component code, duty station, CSA, CBSA, LPA, State, County or City.  4th Long Decl. ¶ 4.  Long asserts that even if they contain geographical information, the organizational component codes and duty stations are not personal to the employee and therefore not a personnel or similar file within the meaning of Exemption 6.

### C.   IRS Awards

#### 1.   Miner Declaration

In support of its decision to redact two award categories from the awards included in the CPDF, OPM submitted a declaration by Janet R. Miner, Chief of Disclosure for the Internal Revenue Service.  According to Miner:

> The only award categories that were redacted from the data disclosed to plaintiff were the awards designated as 885 - Performance Award (an award based on an employee's performance for that rating period) and 840 - Individual Cash Award.  The category designation 885 was discontinued in 2000 as a separate category as recorded in the CPDF and was thereafter subsumed within the category 840 - Individual Cash Award.  Consequently, the only method of redacting the amount of an individual's Performance Award for years after 2000 is to redact category 840 - Individual Cash Award.  Since October 2000, Category 840 has also included those awards formerly designated separately as Category 877 - Special Act of Service (an award given for a specific act or service and not tied to an employee's overall performance during the rating period).

Miner Decl. ¶ 6.[4]  Miner states that "[o]ther than awards in Category 840 and 885, the award and bonus categories . . . were not redacted from the data provided to plaintiffs" and were in fact provided.  Miner Decl. ¶ 6.

Miner explains that the scarcity of these awards "may explain why it may have appeared [to plaintiffs] that all award amounts were redacted from the data provided".  Miner Decl. ¶ 7.

---

[4]There are two paragraphs (between paragraph 5 and paragraph 7) in Miner's declaration numbered 6.

According to Miner, "[a]lthough Category 840 includes one non-performance based award category (877 - Special Act of Service) in addition to the performance based award, the method by which performance awards are given to IRS bargaining unit employees makes it easy to identify who has gotten a performance award and what their performance appraisal score was." Miner Decl. ¶ 7.  Further:

> Because the vast majority of the IRS employees whose award amounts were redacted received only one award, it would be very easy for someone to reverse engineer the performance appraisal scores of most of those employees if given access to their redacted award amounts.  This is true even taking into account the fact that a small percentage of employees may have gotten more than one award in a particular quarter.  The data from 2005 and 2006 indicates that approximately 85 percent of those employees who receive awards receive only one award in any given quarter.  Approximately 10-14 percent receive 2 awards and one percent receives more than 2 awards.

Miner ¶ 10.

Miner avers that "[d]ue to the method by which performance awards are computed, it is also possible to determine which employees received more than one award as well as which employees received a non-performance based award."  Miner ¶ 11.  Miner explains that employees in any award pool who rank in the highest 55 percent "for average Critical Job Element (CJE) scores on their performance appraisals" receive performance awards.  Miner Decl. ¶ 12.

Miner includes a hypothetical fifteen-person pool of employees, along with their grade and award amount to illustrate how "one can 'reverse engineer' each employee's [critical job element] average".  Miner Decl. ¶ 14.

## 2.    Long Declaration

In her declaration, Long responded that it is impossible to reverse-engineer the awards to determine an employee's appraisal score, and averred that if an individual did not receive an appraisal award, it would not be possible to deduce his or her appraisal score.  Long admitted, however, that in such a case "one would have . . . the generalized knowledge that the individual's score was not high enough to rate an award."  3d Long Decl. ¶ 39.

### D.      Redactions

Long states in her declaration that she has examined the relevant CPDF files released to them by OPM, and asserted that there are "problems with redaction-marking".  3d Long Decl. ¶ 42.  According to Long, "OPM sometimes marks that it has redacted information from a record when that record was blank to begin with, sometimes leaves blanks where it has redacted information, and sometimes withholds records without indicating on the released portions of the record that information has been withheld." 3d Long Decl. ¶ 42.

In her fourth declaration, Long states that OPM has provided three sets of the CPDF files, each time claiming that it followed FOIA's requirements "only to later recognize the need to provide us with new copies." 4th Long Decl. ¶ 17.  "Because OPM clearly has some problems with its programming that have kept it from properly marking redactions, and because it does not always discover those problems on its own", Long asserted that "[i]n order . . . to know with more certainty what OPM has . . . redacted, I would need an 'audit trail' from the execution of OPM's program(s) that generated the copies furnished me."  4th Long Decl. ¶ 18.

According to Lukowski, any errors in disclosure were due "to a programming oversight" and he and his "staff performed all other appropriate and necessary redactions with respect to all other records released to plaintiffs."  4th Lukowski Decl. ¶¶ 20-22.

IV.     **DISCUSSION**

Presently before the Court are the parties' cross-motions for summary judgment regarding OPM's refusal to disclose: (1) the name and duty stations of employees in "sensitive" occupations; (2) the duty stations, including CSA, CBSA, and LPA information, and organizational component codes for employees in "sensitive" occupations; and (3) the total award amounts received by IRS employees.  Also at issue are "46 unreleased data elements" and whether OPM properly marked redactions in the records it disclosed to plaintiffs.

A.      **FOIA**

"FOIA was enacted to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed."  *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation marks omitted). "FOIA strongly favors a policy of disclosure and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act." *National Council of La Raza v. Department of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (citing 5 U.S.C. § 552(a)(3), (b)(1)-(9)).  Courts construe these exemptions narrowly, resolving all doubts "in favor of disclosure".  *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir.1988).  The government bears the burden of showing "that any claimed exemption applies." *National Council of La Raza*, 411 F.3d at 356.  Courts review the government's decision to withhold or redact information *de novo*.  5 U.S.C. § 552(a)(4)(B).

B.      **Summary Judgment Standard**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive

law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id*. The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id*. at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985).

### C.      Summary Judgment in FOIA Cases

The Second Circuit has described the procedure for resolving motions for summary judgment in FOIA cases as follows:

> In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA. Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden. Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face. When this is the case, the district court may forgo discovery and award summary judgment on the basis of affidavits.

24

> In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.

*Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citations, internal footnote, and quotation marks omitted).

### 2.    Exemption 6

FOIA Exemption 6 protects against disclosure that implicates personal privacy interests. The government may withhold records in "personnel and medical files and similar files" only when their release "would constitute a *clearly unwarranted* invasion of personal privacy." 5 U.S.C. § 552(b)(6) (2006) (emphasis added). "Exemption 6 is intended to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Wood v. Federal Bureau of Investigation*, 432 F.3d 78, 86 (2d Cir. 2005) (quoting *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982)). To determine whether names and other the other records at issue may be withheld under exemption 6, the Court must: (1) "determine whether the personal information is contained in a file similar to a medical or personnel file", that is "whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file"; and (2) "balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the names would constitute a 'clearly unwarranted invasion of personal privacy.'" *Id.* (quoting 5 U.S.C. § 552(b)(6)).

### A.    Sensitive Occupations - Name and Duty Station

With regard to the "sensitive" occupations, the parties agree that an employee's name, alone, or in combination with his or her duty station, and organizational component code, is a "similar file" to a personnel file. Therefore, the Court must balance the public's need for the information against the individual's privacy interest to determine whether OPM has established that disclosure of the names and duty stations of the employees engaged in "sensitive" occupations is clearly unwarranted.

The names and duty stations of these employees may be withheld only if the disclosure of their "identities would result in a 'clearly unwarranted invasion of personal privacy.'" *Wood*, 432 F.3d at 87 (quoting 5 U.S.C. § 552(b)(6)). The Second Circuit has explained that "to make this determination, a court must balance the public's interest in disclosure against the individuals' privacy interests." *Id*. at 87-88 (citing *Department of Air Force v. Rose*, 425 U.S. 352, 372 (1976); *Hopkins v. United States. Dep't of Hous. & Urban Dev*., 929 F.2d 81, 86-87 (2d Cir. 1991)). "The privacy side of the balancing test is broad and "encompasses all interests involving the individual's control of information concerning his or her person." *Id*. at 88 (internal quotation marks omitted). "On the other side of the balance, the relevant interest is 'the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.'" *Id*. at 88 (quoting *Bibles v. Oregon Natural Desert Ass'n*, 519 U.S. 355, 355-56 (1997) (internal citation and quotation marks omitted).

"Names and other identifying information do not always present a significant threat to an individual's privacy interest." *Id*. (citing *United States Dep't of State v. Ray*, 502 U.S. 164, 177 n.

12 (1991).  "Instead, whether the disclosure of names of government employees threatens a significant privacy interest depends on the consequences likely to ensue from disclosure."  *Id.*

In support of its decision to redact the names and duty stations of employees in the nineteen "sensitive" occupations, OPM submitted four declarations by Lukowski.  In his third declaration, outlined above, Lukowski specifically addressed each occupation, the responsibilities of employees within each occupation, and why OPM deemed the occupation sensitive.  OPM asserts that because the employees in the occupations at issue are engaged in law enforcement, matters related to national security, and/or the gathering of intelligence, the public disclosure of lists of their names and locations could subject these employees to harassment or attack.

In opposition, plaintiffs assert that the occupations "are broad, and employees have differing responsibilities" and that not all of the employees within any of the occupations are involved in law enforcement or engaged in sensitive work.  Lukowski admits that not all positions within an occupation are sensitive, but asserts that "a large number of positions" within each occupation "are indeed sensitive" and "[i]t is not feasible . . . to identify each position that is sensitive versus those that are not".  4th Lukowski Decl. ¶ 4.  The Second Circuit has recognized that "individuals, including government employees and officials, have privacy interests in the dissemination of their names."  *Massey v. Federal Bureau of Investigation*, 3 F.3d 620, 624 (2d Cir. 1993).  In view of the potential for harassment or attack to which these employees, by virtue of the nature of their occupations, could be subject if lists of their names and locations are disseminated publicly, the Court concludes that OPM has shown these individuals have a "more than *de minimis*" privacy interest in their names and duty stations.

Since a measurable privacy interest in avoiding possible harassment and attack is implicated in this case, the Court must weigh that interest against the public's interest in the disclosure of the names and duty stations of these employees.  *See Associated Press v. United States Dep't of Defense*, 554 F.3d 274, 287 n. 13 (2d Cir. 2009) ("the identification of this privacy interest means . . . that the FOIA requester will have to show how release of the . . . names . . . will further the public interest").  "An invasion of more than a *de minimis* privacy interest protected by Exemption 6 must be shown to be 'clearly unwarranted' in order to prevail over the public interest in disclosure."  *Federal Labor Relations Auth.* v. United States Dep't of Veterans Affairs, 958 F.2d 503, 510 (2d Cir. 1992).  "Exemption 6 does not protect against disclosure every incidental invasion of privacy-only such disclosures as constitute 'clearly unwarranted' invasions of personal privacy."  *Rose*, 425 U.S. at 382.  The Court must balance the identified "privacy interest against FOIA's basic purpose of opening agency action to the light of public scrutiny."  *Associated Press*, 554 F.3d at 293.

Plaintiff Long avers that the disclosure of names enables monitoring of the government's activities because "who those people are can make a real difference in how much work is done and how that work is done.  Particularly in areas in which government employees have discretion, such as in many areas related to law enforcement, the individual and his or her particular interests and skills can have a large effect on what the government actually does."  1st Long Decl. ¶ 36.  Long further states that knowing the names of those in policy-making positions "can explain why certain policies and practices exist within certain parts of an agency".  *Id*. at ¶ 37.  Additionally, the "redaction of names and duty stations . . . has prevented TRAC from being able to perform analyses on the effects individual personnel may have had on recent changes in law enforcement

28

levels." *Id*. at ¶ 38.  The names of federal employees would allow both  "the tracking of personnel movements and turnover that can help explain changes in day-to-day agency activities" and "the public to examine whether employees are qualified".  *Id*. at ¶ 39.  Long further argues that the disclosure of names and duty stations would allow the public to detect mismanagement and uncover illegal or unethical behavior.  ¶¶ 40-45.        Thus, plaintiffs assert, they have demonstrated that the "public could learn about the government's activities, priorities, and management directly through disclosure of the names themselves."  The Court, however, finds that plaintiffs' proposal for disclosure of the names of employees in these "sensitive" occupations is clearly unwarranted and therefore that OPM properly withheld the names under Exemption 6.

OPM argues that any link between the names of employees in the occupations at issue and the function of the government agencies they work for is too attenuated to warrant disclosure. The Court agrees. "Whether the public interest in disclosure warrants the invasion of personal privacy is determined by the degree to which disclosure would further the core purpose of FOIA, which focuses on 'the citizens' right to be informed about what their government is up to.'" *Associated Press*, 554 F.3d at 285 (quoting *Ray*, 502 U.S. at 177).  In this case, the names themselves would reveal only the identities of all employees in "sensitive" occupations; once the lists of names are public, it would take further investigation and analysis before plaintiffs, or anyone else, could glean anything useful about the agencies for which they work.  *See id.* at 292 ("We emphasize that 'the focus, in assessing a claim under Exemption 6, must be solely upon what the requested information *reveals*, not upon what it might lead to." ) (quoting *Ray*, 502 U.S. at 180 (Scalia, J. concurring) (emphasis in original)).

29

Having found that disclosure of the names constitutes an invasion of personal privacy, and having found no public interest on the other side of the balancing test, the Court concludes the invasion of privacy occasioned by the disclosure of the names is "clearly unwarranted". Accordingly, the Court finds that OPM properly asserted Exemption 6 in redacting the names.

**B.    Sensitive Occupations - Duty Station and Organizational Component Code**

Plaintiffs next argue that even if OPM properly withheld the names of employees in "sensitive" occupations, it cannot justify withholding duty stations and organizational component codes from disclosure under Exemption 6 because none of that information implicates an employee's privacy interests.  OPM contends, however, that each duty station and organizational component code "applies to a particular individual" and when combined "can be identified as applying to that individual."

Assuming, without deciding, that duty station and organizational component codes fall under the broad definition of "similar files", the Court must next consider whether employees in these "sensitive" occupations have "more than a *de minimis* privacy interest in the disclosure"of their duty stations and organizational component codes.  *Associated Press*, 554 F.3d at 292.

In her fourth declaration, Long asserts that an employee's location and identity cannot be derived from the organizational component code, duty station, CSA, CBSA, LPA, State, County or City.  4th Long Decl. ¶ 4.  Therefore, plaintiffs argue, disclosure would not implicate and employee's privacy interest.  In opposition, Lukowski asserts that the identities of an unspecified number of federal employees could be deduced from the disclosure:

> As of September 2007, there is at least one CBSA with only one Federal civilian employee.  There are several CBSAs with only two employees, one with three employees and many more with low numbers.  Furthermore, when breaking down

> numbers of federal employees into the individual occupational categories, the
> possibility of pinpointing their individual identities because of low numbers of
> employees in occupational categories associated with the various duty station location
> fields increases even more. For example, there are 208 CBSAs containing fewer than
> ten [individuals employed in the criminal investigating occupational series].

4th Lukowski Decl. ¶ 15.

Courts have recognized individuals' privacy right in information "that might identify" them, *Malizia v. United States Dep't of Justice*, 519 F.Supp. 338, 348-49 (S.D.N.Y. 1981). Here, however, OPM only asserts that disclosure of duty station and organizational component code would increase the "possibility" in some instances. OPM, however, does not explain *how* employees could be identified from the disclosure of their duty stations and organizational component codes. According to OPM's evidence, the duty station information, if disclosed, would reveal: the geographic location where an employee works, i.e., country, state, county, city, the CBSA, CSA, and LPA. The organizational component code, if disclosed, would reveal: the specific organization in which the employee works, including the city and state or city and country in which the organization is located. "[D]isclosure of personal information constitutes only a *de minimis* invasion of privacy when . . . identities . . . are unknown." *Ray,* 502 U.S. at 176. The Court finds that this information does not involve a measurable privacy interest because it is not the kind of information "that a person would ordinarily not wish to make known about himself or herself." *Associated Press*, 554 F.3d at 292-93 (citing *Ray*, 502 U.S. at 181). Thus, OPM has failed to show that disclosure of the organizational component codes and duty stations without the identities, or anything else linking the location of employment to the individuals, amounts to more than a *de minimis* invasion of privacy.

OPM further argues that disclosure of the organizational component codes, and duty stations of employees in sensitive positions, would reveal the locations of these employees and: "disclose[] areas where investigations may be concentrated"; "demonstrate concentration of sensitive government activities"; "reveal concentrations of persons involved in [intelligence] activities and potentially compromise the ability of the Federal government to collect information relevant to national security"; "could potentially hamper the Federal government's tax collection activities"; "could unduly affect Federal activities of a sensitive nature"; "could compromise the effectiveness of Federal investigations and law enforcement activities of a sensitive nature", "would . . . identify geographic areas in which highly sensitive government operations [regarding customs and border interdiction] are being conducted.  Those areas where border interdiction has not increased could be seen as "low risk" areas or entry points which could encourage people to attack or harass these individuals and their families"; "international terrorists or criminals trying to enter the country could use detailed location data to target Border patrol agents and their families for attack or harassment"; "identify areas where the presence of [customs inspection] employees is thin, thereby exposing potential entry points for the importation of items that could be used for illegal and destructive activities"; and "adversely affects the ability of the United States government to monitor and protect its borders and further places the persons conducting those activities and their families at greater risk of harassment or attack".  3d Lukowski Decl., ¶¶ 5, 6, 7, 9, 10, 11, 12, 13, 15, 19, 20, 21, 22.

While some of these reasons might support OPM's decision to withhold duty station and organizational component code information under a different FOIA exemption, none reveal anything about any individual.  Thus, OPM has failed to show more than a *de minimis* privacy

interest in the disclosure geographic location of federal employees.  The Court, therefore, finds that OPM has not sustained its burden of showing that the disclosure of the organizational component codes and duty stations of employees in sensitive positions is clearly unwarranted. Accordingly, OPM's motion for summary judgment regarding the duty station[5] and organizational component codes of employees engaged in sensitive occupations is denied and plaintiffs' cross-motion for summary judgment on this issue is granted.

### C.    IRS Awards

According to Miner, the only awards the IRS redacted were award categories designated as performance awards and individual cash awards.  Miner states that there is one award within the individual cash award category that is non-performance based, but given for a "special act or service".  Long contends that it is impossible to reverse-engineer the awards to determine an employee's appraisal score, and points out that if an individual did not receive an appraisal award, it would not be possible to deduce his or her appraisal score.

Although the parties hotly dispute whether an IRS employee's "total award" can be "reverse-engineered" to obtain the employee's performance appraisal score, their disagreement is immaterial.  It is undisputed that each total award amount, or lack thereof, is linked to an individual IRS employee and his or her employment performance, and could, as Long admits, at the very least, reveal that an employee's appraisal score was too low to merit an award.  *See* 3d Long Decl. ¶ 39 ("one would have . . . the generalized knowledge that the individual's score was not high enough to rate an award.") .  That an employee's name is not connected to the award

---

[5]This is only with respect to the duty stations and organizational component codes of employees engaged in "sensitive occupations" addressed in the parties' motions for summary judgment, not Department of Defense employees - about which plaintiffs make no argument.

amount is inconsequential here because the award, or absence of one, is linked directly, and unique, to that employee.

Award information is private and disclosure implicates more than a *de minimis* privacy interest. *See Warren v. Social Security Admin.*, No. 98-CV-0116E (SC), 2000 WL 1209383, at *4 (W.D.N.Y. Aug. 22, 2000) ("award nominations represent intensely private information in one's personnel file, and accordingly . . . these documents are within Exemption 6 of the FOIA."), *aff'd in relevant part, remanded on other grounds*, 2001 WL 514312 (2d Cir. May 15, 2001); *Celmins v. U.S. Dept. of Treasury,* 457 F.Supp. 13, 15 (D.D.C. 1977) ("evaluation of an individual's work performance, even if favorable, is personal information").

Since there is more than a *de minimis* privacy interest at stake, the Court must balance the employees' interest in the award information against the public's interest in disclosure. Plaintiffs assert the public has a strong interest in "being able to see whom the government is rewarding" and ensuring that the IRS is complying with regulations prohibiting it from "using records of tax enforcement results to evaluate employees or impose production quotas or goals." Plaintiffs, however, provide no evidence of IRS wrongdoing or the issuance of improper rewards. On balance, therefore, the Court concludes that employees' interest in keeping performance based awards, or the lack thereof, private outweighs any public interest in disclosure of this information. Thus, OPM has established that it properly withheld the "Total Award" category from disclosure pursuant to Exemption 6. Accordingly, OPM's motion for summary judgment on this issue is granted and plaintiffs' cross-motion for summary judgment is denied.

**D.    46 Occupations**

The parties agree that TRAC did not receive the "46 data elements" "because OPM did not consider them within the scope of their requests."

### E.    Redactions

Finally, plaintiffs request an order directing OPM to provide "an 'audit trail' from the execution of OPM's program(s) that generated the copies furnished me" to enable them to determine whether OPM properly marked all redactions.  Plaintiffs cite no legal authority for the issuance of such an order.  Moreover, OPM has acknowledged its obligation to indicate the "amount of information deleted . . . on the released portion of the record" where "technically feasible" pursuant to 5 U.S.C. § 552(b).  Accordingly, the Court finds no basis for the issuance of such an order at this time.

## V.    CONCLUSION

For the foregoing reasons it is hereby

**ORDERED** that **defendant's motion for summary judgment** is **denied** with respect to the duty station and organizational component code information of employees in "sensitive" occupations; and it is further

**ORDERED** that **plaintiffs' cross-motion for summary judgment** is **granted** with respect to the duty station and organizational component code information of employees in "sensitive" occupations; and it is further

**ORDERED** that **defendant's motion for summary judgment** is otherwise **granted** in its entirety; and it is further

**ORDERED** that **plaintiffs' cross-motion for summary judgment** is otherwise denied in its entirety; and it is further

35

ORDERED that the **Clerk of the Court enter judgment accordingly** and **close this case**.

**IT IS SO ORDERED.**

Date:  February 23, 2010

_____
Norman A. Mordue
Chief United States District Court Judge

36